SMITH, Justice:
This appeal is from a decree of the Chancery Court of Granada County entered in the contest of the purported will of the late Thomas Taylor Hayward, pursuant to a jury verdict, denying probate.
The testator was quite old and, according to all witnesses, almost totally blind and deaf. He suffered also in some degree from arteriosclerosis and was in poor physical condition. Notwithstanding his disabilities, it was not disputed that, throughout the period in which the will was executed, Hayward was able to attend to his own business affairs personally, and did so attend to them.
Following his death on November 18, 1971, there was offered for probate as Hayward’s last will and testament a written instrument dated May IS, 1970, executed by him and purporting to be his last will and testament, which had been drafted by an experienced and reputable member of the Grenada County Bar and witnessed by him and by a young lady who served that attorney as his secretary. Probate was intercepted by the filing of caveat by the 78 year old widow of the testator and 7 of his 8 children. It was alleged by the contestants that the purported will (1) was not the will of the testator but had been the product of undue influence brought to bear upon him by appellant, one of his sons, and (2) that the alleged testator had lacked testamentary capacity at the time of its execution.
Under the terms of the document offered for probate, all of testator’s property, real and personal, was devised and bequeathed to appellant and another of testator’s sons as trustees, to be devoted to the care, support and benefit of his widow during her lifetime, apparently with the, right to consume the corpus for those purposes, although construction of the document is not before us in this case.
It was provided that upon the death of the widow, appellant was to have the house and -lot formerly occupied by the testator, and that the remainder of testator’s property should be divided equally among testa *208 tor’s 8 children. Two other of testator’s sons were named as executors of this will.
Upon the conclusion of the trial, after all of the evidence was in, the chancellor declined to submit to the jury the issue tendered by contestants that the will had been the product of undue influence brought to bear by appellant upon his father, since there was not a syllable of proof to support that charge. The correctness of the chancellor’s action in this regard is expressly recognized in their brief on this appeal by appellees.
The issue of testamentary capacity, however, was submitted to the jury by the chancellor and, upon that issue the jury returned a verdict against the will. A decree was entered accordingly. Careful study of the record convinces us that the chancellor erred in submitting this issue to the jury.
The essence of the testimony of the several lay witnesses who testified for the contestants upon the issue of testamentary capacity is that at various times the testator failed to recognize persons whom he knew until they were very close to him, and that often the testator did not understand what was said to him because of his almost total deafness. A fair construction of this testimony is that testator’s failure to recognize persons whom he knew until they were “very close” was due, not to mental impairment, but to his blindness. Also, his deafness, which all concede, made it quite difficult (as it was said) to “communicate” with him.
Two doctors were offered by contestants as witnesses. One of these, Doctor Eason, was an internist, practicing in Memphis, Tennessee. This doctor stated quite frankly that he had no special training or experience in psychiatric practice. He had treated the testator in 1966 in Memphis for peptic ulcers. This doctor saw him again in a Memphis hospital some 3 years later, where he was again treated for peptic ulcers. There is nothing in the testimony of this physician of any incident, or of any behavior on the part of the testator, indicative of impairment or-loss of his mental faculties, unless his statement that testator had seemed lethargic and had no appetite can be so considered. It is clear from the doctor’s testimony that the only basis for his assumption that it was unlikely that Hayward would have had “testamentary capacity” on the date of the execution of the will was based upon the fact that Hayward had been suffering from arteriosclerosis. For that reason, and that reason alone, Doctor Eason said that he wouldn’t “expect” Hayward to have had “testamentary capacity.” The doctor said also that a person suffering from this condition could have lucid intervals although he would not have “expected” Hayward to do so. He conceded that if Hayward’s wife and children came into the room that Hayward would know them. The only contact this witness had with the testator was upon the brief occasions when he treated him in Memphis for peptic ulcers.
The other doctor offered by contestants on the issue of testamentary capacity was a Doctor James. This doctor said that he' had been Hayward’s “family physician” for some 25 years. He also said that he had seen Hayward some 4 or 5 times in the period 1968-1970. He said that, “I have an opinion, but this is not a fact. I do not think he was mentally competent at that time.” However, Doctor James did not see Hayward on the date of the execution of the will, and when asked if Hayward “was mentally competent on that day or had lucid intervals” answered, “It’s possible but improbable.” As with Doctor Eason, Doctor James also based his ideas upon the fact that Hayward had been suffering from arteriosclerosis and not upon incidents, or acts on the part of Hayward, which would indicate unsoundness of mind or lack of mental capacity. Doctor James concluded his testimony by admitting, however, that on the times when he had seen Hayward prior to May 15, 1970, the date on which the will was executed, Hayward *209 would have known his wife and children and also knew what property he owned.
It is not contended that every sufferer from arteriosclerosis is mentally incompetent. In fact, medical authority has it:
In routine autopsies, at least 75% of brains of individuals over 50 show arte-riosclercotic changes of a quantitative degree, and as the age group goes higher, the percentage of arteriosclerotic arteries increases until it probably becomes 100%. Since many of these individuals showed no impairments, either mental or neurological, which could be ascribed to the arteriosclerosis, it is obvious that it is equally wrong to ascribe all mental or neurological changes before death to an arteriosclerotic type of cerebral arterial change if the latter is found at autopsy. It might be pointed out here that this is an error which is not infrequently made.
(3B R. Gray, Attorney’s Textbook of Medicine, Par. 91.82, at 91-135 (3rd ed., Supp.1974).
In the examination of the doctors it was not made clear what was meant by “testamentary capacity.” In the case of Doctor James it affirmatively appears that it was Doctor James’ opinion that at the time the will was executed Hayward did know the natural objects of his bounty and of what his estate consisted.
As opposed to this, the attorney who drafted the will and who is an experienced and reputable member of the Grenada County Bar, testified unequivocally that the testator was fully aware of the natural objects of his bounty on the date that the will was prepared and executed and knew the nature and extent of the property owned by him. He stated that the provisions incorporated in the document were given to him by Hayward who instructed him as to how he wished to leave his property. When Hayward returned to the attorney’s office following preparation of the will, it was read and approved by him as correctly expressing ■ his wishes _ as to the testamentary disposition of his property. Hayward then executed the document in the presence of the attorney and of the attorney’s secretary, who each signed and attested the will in the testator’s presence. Hayward told these witnesses that the document was his will and that he wanted them to witness it.
In addition to this testimony of the attesting witnesses, several lay witnesses testified in detail as to the soundness of Hayward’s mind throughout the period in which the will had been executed.
Finally, another experienced and reputable member of the Grenada County Bar, in no way associated with the attorney who drafted the will, and who was also a certified public accountant, testified that he had known Hayward for 16 years and had done various legal work for him. This attorney-accountant testified further that he had prepared Hayward’s 1969 income tax, return in 1970, and for that purpose had interviewed Hayward to obtain the necessary data on or about May 6, 1970, 9 days before the execution of the will. The attorney-accountant said that he had done Hayward’s tax work and had prepared his income tax returns for the previous 10 years, and that Hayward always appeared to know what he was doing and that he could understand what was being said, that Hayward had a good mind and was capable of conveying to his attorney-accountant the figures and data necessary for the preparation of his tax returns.
In speaking of testimony offered to establish lack of testamentary capacity in the case of Ward v. Ward, 203 Miss. 32, 33 So.2d 294 (1948), this Court said:
When assembled apart from other conduct and dissociated from those periods of calm and discretion which all witnesses for the contestants conceded, they could constitute an impressive challenge. However, this testimony fails to establish the fact that at the crucial moment *210 when evidence of testamentary capacity attains its maximum and controlling relevancy, that is, at the time of the will’s execution, there was any lack of capacity to appreciate the nature and effect of his act and the natural objects of his bounty. Lum v. Lasch, 93 Miss. 81, 46 So. 559. On the contrary, the only available attesting witness testified to the testator’s complete sanity at the time of his careful examination, before signing, of the will as to whose contents and import he made intelligent and solicitous inquiry. Compare Gholson v. Peters, 180 Miss. 256, 176 So. 605. Assuming that there were detached incidents of conduct suggesting aberration, the establishment of intervals of unquestioned lucidity, during one of which the will was executed, so far outweighs the inferences from isolated instances of eccentric deviations as to depreciate such instances below a substantial probative value. In this connection, it is appropriate to note that none of the host of witnesses for the proponents, many of whom had known the testator long and intimately, and none of whom, with possibly one exception, had a personal or financial interest in the issue, were or had ever been aware of any abnormal conduct or emotional upset.
We have not been at pains to delineate these illustrative incidents since neither this case nor those from which controlling principles have evolved are ever duplicated in their factual patterns.
(203 Miss, at 37-38, 33 So.2d at 295-296).
The uncontroverted facts are that testator was old, almost totally deaf and blind and suffered, in some unspecified degree, with arteriosclerosis. This is not significantly inconsistent with testimony of the attorney who drew the will, and of the attorney-accountant (and others) that testator, nevertheless, was mentally competent, and understood and handled his own business affairs during the period in which the will was executed. The provisions of the will itself (and the family doctor’s testimony) show that testator did know the “natural objects of his bounty” as well as what property he owned. The testator himself gave this very information to the attorney who drafted the will and also supplied him with portions of a land description. Also, uncontrovertibly reflected by the will itself is the fact that the testator understood and appreciated that it was his prime responsibility to provide for his widow during her lifetime. To that end he first provided that all of his property, real and personal, should be devoted to her support and care so long as she lived. Nor is it so unnatural as to call in question testator’s mental capability that he left the house and lot, where he had lived, to one of his sons, appellant, subject to the widow’s life interest, rather than to all of his 8 adult children together. A house and lot left to 8 adults, some of whom, at least, had families of their own, would necessitate, almost certainly, a sale and division of the proceeds. With this one exception, after the death of his widow, the testator provided that all that then remained should be divided equally among his 8 children.
Upon the whole record, we think, it is manifest that testator did possess the mental capacity to execute the will. This view is strengthened by the admitted fact that no undue influence whatever was brought to bear upon him in connection with the will and thus it must be considered that the will reflects the testator’s own wishes. Neither deafness, blindness nor the infirmities of old age, if they do not destroy or gravely impair the mental faculties, are sufficient to deprive one of the valuable right to dispose of his property by will, according to his own wishes.
We have concluded, therefore, that the evidence offered as tending to establish a lack of testamentary capacity on the part of Hayward at the time he executed the will in this case is not as strong as in Ward, supra, and, at most, it amounts to no more than a scintilla and is wholly incapable of supporting the charge. It was error for the chancellor to submit to the jury *211 the issue as to testamentary capacity and appellant’s request for a directed verdict on that issue also should have been granted. The case will, therefore, be reversed and a decree will be entered here for the appellant.
Reversed and decree entered for appellant.
GILLESPIE, C. J., and ROBERTSON, SUGG and BROOM, JJ., concur.