MAXWELL, J.,
 

 for the Court:
 

 ¶ 1. Robert H. “Bob” Noblin executed his last will and testament only hours before his death. The proponents of the will and the sole beneficiaries under it, Sammy Burgess and Sheila McDill, initiated probate proceedings in Smith County. Nob-lin’s numerous heirs at law contested the will, asserting it was the product of undue influence. The trial court granted the contestants’ request for a jury trial, and the jury returned a verdict in favor of the proponents.
 

 ¶ 2. On appeal, the contestants contend that a confidential relationship existed between the testator and the proponents, raising a presumption of undue influence. They argue the proponents failed as a matter of law to overcome this presumption by clear and convincing evidence. In the alternative, the contestants claim the trial court erred in peremptorily instructing the jury that the testator possessed testamentary capacity. They also argue the trial court erred in failing to grant their proposed peremptory instruction, which would have directed the jury to find the existence of a confidential relationship.
 

 ¶ 3. We find no reversible error and affirm.
 

 FACTS
 

 ¶ 4. Noblin died in the early morning hours of October 3, 2003. He left behind no close “blood” relatives. Noblin’s closest relatives by consanguinity appear to be an aunt and an uncle. His uncle is one of the contestants along with multiple first cousins.
 
 [1]
 
 The proponents, Burgess and McDill, are Noblin’s stepchildren. Nob-lin’s only wife, who passed away in 1994, was the natural mother of Burgess and McDill. But because Noblin never adopted Burgess or McDill, they bear no
 
 *286
 
 relationship to him under Mississippi’s law of intestate succession.
 
 [2]
 

 ¶ 5. Although Noblin did not make a will until the final hours of his life, he had named Burgess and McDill as contingent beneficiaries (entitled to payment if his spouse predeceased him) on his individual retirement accounts (IRAs) and certificates of deposit. In 1989, Noblin listed Burgess and McDill as his “son” and “daughter” on his IRA applications.
 

 ¶ 6. On September 23, 2003, Burgess took Noblin to see a doctor because Noblin had been having physical problems.
 
 [3]
 
 Burgess later took Noblin to Lackey Memorial Hospital in Forest, Mississippi. While there, Noblin’s doctors determined he had widespread liver and pancreatic cancer. Shortly after this diagnosis, Burgess drove Noblin to Baptist Hospital in Jackson, Mississippi. Soon after Noblin’s arrival, his physicians determined he had no treatment options other than taking medication to control his pain. Noblin remained at Baptist Hospital from September 29 until he died on October 3. Burgess and McDill attended to Noblin during these five days and took turns spending the night with him.
 

 ¶ 7. On October 1, 2003, Burgess called Todd Sorey, an attorney back home in Smith County. The call was placed from Noblin’s hospital room, where only Noblin and Burgess were present. According to Burgess, he contacted Sorey at Noblin’s request. Burgess asked Sorey to draft Noblin’s will, and Sorey agreed to do so. Both McDill and Burgess testified that it was Noblin’s idea, and not their own, to make the will. Noblin never spoke with Sorey directly over the phone. Instead, Burgess talked to Sorey on the phone and relayed information back and forth between Sorey and Noblin. According to Burgess, McDill, and Sorey, Noblin had a severe hearing problem and was unable to personally speak to Sorey over the telephone.
 

 ¶ 8. Sorey testified he could hear Noblin responding to his questions. He also heard Noblin speaking about the information he wanted in his will. According to Sorey, he had known Noblin most of his life and was familiar with his voice. Sorey claimed that he could hear Noblin’s voice over the phone. He recognized the tone, vernacular, and accent as Noblin’s. Sorey maintained he had no doubt that he was speaking to Noblin, albeit with Burgess as an intermediary.
 
 [4]
 
 Sorey testified that he heard Noblin express his desire to leave all his property to Burgess and McDill.
 

 ¶ 9. After this phone conversation, Sorey drafted a will leaving Noblin’s entire estate to Burgess and McDill. McDill picked up the will at Sore/s office on October 2 and brought it back to the hospital in Jackson. Burgess then asked Noblin’s nurse, Lynn Thornton, to find hospital employees to witness the will. Thornton herself agreed to witness the will. She recruited Corley Callum, also a registered nurse, to fill the role of the other attesting witness.
 

 ¶ 10. Of the two attesting witnesses, only Callum testified at trial. According
 
 *287
 
 to Callum, immediately before witnessing the will, she had a conversation with Nob-lin. Though she could not remember the exact exchange, she satisfied herself that Noblin’s will reflected his intent. Callum testified that through her conversations with Noblin at the time the will was executed, she was able to verify that “what was taking place was what he wanted to do.”
 

 ¶ 11. Noblin executed his will on the afternoon of October 2 some time between 12:00 p.m. and 3:00 p.m. He died at 12:10 a.m. on October 3.
 

 PROCEEDINGS AND DISPOSITION IN THE TRIAL COURT
 

 ¶ 12. Following Noblin’s death, Burgess and McDill initiated probate proceedings in the Smith County Chancery Court. The contestants filed a will contest and requested a jury trial. The chancellor then transferred the case to Smith County Circuit Court, where a jury trial was held.
 
 [5]
 

 ¶ 13. The trial judge granted a directed verdict in favor of the proponents on the issue of testamentary capacity. The trial court later gave a peremptory instruction for the jury to find the testator possessed the requisite capacity to make a will. The court, however, submitted to the jury the issues of (1) whether a presumption of undue influence arose by virtue of a confidential relationship between the testator and the proponents, and (2) whether clear and convincing evidence existed to overcome the presumption of undue influence. The trial court denied the contestants’ request for a peremptory instruction on issue (1).
 

 ¶ 14. Following a three-day trial, the jury found in favor of the proponents, and the trial court entered a judgment reflecting the jury’s decision.
 

 STANDARD OF REVIEW
 

 ¶ 15. In reviewing a jury verdict, we apply the following standard:
 

 [An appellate court] resolves all conflicts of evidence in the appellee’s favor and determines all reasonable inferences from testimony given towards the appel-lee’s position. Reversal occurs only where the facts presented are so overwhelming in the appellant’s position that reasonable jurors could not have found for the appellee. When an appellant challenges the sufficiency of evidence to support a jury’s verdict, the appellate court’s scope of review is limited. All evidence must be reviewed in the light most favorable to the appellee. An appellate court may only reverse a jury verdict when the facts considered in that light point so overwhelmingly to the appellant’s position that reasonable men could not have arrived at a contrary verdict. In the event that evidence is conflicting, a jury is the sole judge of the credibility of witnesses and the weight of their testimony.
 

 In re Estate of Dabney v. Hataway,
 
 740 So.2d 915, 919 (¶ 11) (Miss.1999) (internal citations and quotation marks omitted).
 

 
 *288
 
 DISCUSSION
 

 I. Undue Influence
 

 ¶ 16. The contestants’ first and main contention is that the proponents presented insufficient evidence to overcome the presumption of undue influence, which they allege arose by virtue of a confidential relationship. On this ground, they ask this Court to reverse and render the judgment of the trial court.
 

 A. Presumption of Undue Influence
 

 ¶ 17. In
 
 Croft v. Alder,
 
 237 Miss. 713, 115 So.2d 683 (1959), our supreme court crafted the confidential relationship doctrine applicable to wills contested on the basis of undue influence. Robert A. Weems,
 
 Wills and Administration of Estates in Mississippi
 
 § 8: 18 (3rd ed. 2003). The
 
 Croft
 
 court held a presumption of undue influence arises where: (1) a confidential relationship existed between the testator and a beneficiary, and (2) the beneficiary in the confidential relationship was actively involved in some way with preparing or executing the will.
 
 Croft,
 
 237 Miss. at 722-23, 115 So.2d at 686. A confidential relationship is present where “one person is in a position to exercise dominant influence upon the other because of the latter’s dependency on the former arising either from weakness of mind or body, or through trust.”
 
 In re Estate of Laughter v. Williams,
 
 23 So.3d 1055, 1063 (¶ 31) (Miss.2009) (citation omitted).
 

 B. Overcoming the Presumption of Undue Influence
 

 ¶ 18.
 
 Croft
 
 also established that once the required showing is made to raise the presumption of undue influence, the burden shifts to the proponents to rebut the presumption by clear and convincing evidence.
 
 Croft,
 
 237 Miss. at 723, 115 So.2d at 686.
 

 ¶ 19. In order to overcome the presumption of undue influence, the proponents must show by clear and convincing evidence: (1) the beneficiary acted in good faith; (2) the testator had “full knowledge and deliberation” in executing the will; and (3) the testator exhibited “independent consent and action.”
 
 In re Last Will and Testament and Estate of Smith v. Averill,
 
 722 So.2d 606, 612 (¶ 22) (Miss.1998). Factors to be considered in assessing the beneficiary’s good faith include:
 

 (1) who initiated the procurement of the will;
 

 (2) where the testator executed the will and who was present at the execution;
 

 (3) what consideration was paid and who paid it; and
 

 (4) whether the execution was done in secrecy or openly.
 

 See id.
 
 Factors to be assessed in determining the testator’s knowledge and deliberation in executing the will include:
 

 (1) whether the testator was aware of his total assets and their worth;
 

 (2) whether the testator understood who his “natural inheritors” were;
 

 (3) whether the testator understood how his action would legally affect prior wills;
 

 (4) whether the testator knew non-relative beneficiaries would be included; and
 

 (5) whether the testator knew who controlled his finances and the method used:
 

 (a) how dependent the testator is on persons handling his finances; and
 

 (b) how susceptible the testator is to be influenced by any such persons.
 

 See id.
 

 ¶ 20. Regarding the testator’s “independent consent and action,” unlike the other two prongs, there is no express list of factors. The supreme court has in the past required a showing that the testator
 
 *289
 
 acted on “[a]dvice of ... [a] competent person, ... disconnected from the [beneficiary] and ... devoted wholly to the ... testator’s interest.”
 
 Murray v. Laird,
 
 446 So.2d 575, 578 (Miss.1984). Though still a relevant consideration, this requirement has been absolved by more recent precedent, which has instead required “a showing of the grantor’s ‘independent consent and action’ based on all of the surrounding facts and circumstances.”
 
 Vega v. Estate of Mullen,
 
 583 So.2d 1259, 1264 (Miss.1991).
 

 1. Good Faith
 

 ¶ 21. Other than inferences that might be drawn from circumstances surrounding the will’s procurement, the contestants produced no evidence that Burgess or McDill influenced Noblin’s decision to make a will or suggested the terms of the will. In fact, the evidence points to the contrary. Burgess and McDill both testified that the idea of making a will originated with Noblin. Burgess testified Noblin wanted him to contact Sorey to draft a will. Sorey testified he could clearly identify Noblin’s voice over the phone, and Noblin expressed his desire to leave all of his property to Burgess and McDill. So-rey explained he was satisfied the will embodied Noblin’s wishes. And just prior to the will’s execution, Callum had a conversation directly with Noblin. Through this conversation, she ascertained the will’s provisions reflected his intent.
 

 ¶ 22. While we recognize much of this testimony is self-serving, our law is clear that -witness credibility determinations are for the jury.
 
 See, e.g., Solanki v. Ervin,
 
 21 So.3d 552, 568 (¶ 41) (Miss.2009).
 
 [6]
 
 Burgess, McDill, and Sorey, in particular, were all vigorously eross-exam-ined about the circumstances surrounding the making of the will.
 

 ¶ 23. It is not disputed that Noblin executed his will in a hospital room. Nob-lin signed the will in the presence of Burgess and McDill, as well as the two subscribing witnesses, Callum and Thornton. Gail Young, a hospital employee, was present to notarize documents. As to the consideration paid, Sorey testified he would have sent the bill for Noblin to pay but was unable to do so. According to Sorey, no one ever told him they would pay his fee for drafting the will, and no one ever paid it. Finally, there is no indication the execution was done in secrecy. The issue here is not whether the heirs had knowledge of the will’s execution, but whether the “the physical place the will was executed was in plain view of the witnesses.”
 
 Estate of Smith,
 
 722 So.2d at 613 (¶ 23). Here, Callum testified she saw Noblin sign the will. The contestants offered no contrary evidence to show the execution was in any way concealed from the view of the attesting witnesses or done in a secretive manner.
 

 2. Knowledge and Deliberation
 

 ¶ 24. Under this prong, the proponents offered a great deal of evidence that Noblin managed and controlled his own personal affairs and finances. At least eight witnesses testified in support of the fact that Noblin was an extraordinarily independent person. Several of the contestants even testified to this fact. For example, contestant Henry Clay Noblin described Noblin as an “independent[] loaner [sic], off to his self [sic] fellow, [who] did his own work.” According to contestant Diane Boykin, Noblin
 
 *290
 
 “made up his own mind about things,” and “[i]t was his way or no way. So, if you asked him something and he answered, that was ... law.” Finally, contestant Ronnie Noblin described Noblin as “strong-willed.”
 

 ¶ 25. Two non-relative acquaintances of Noblin’s also echoed these sentiments. According to David Gainey, who had known Noblin since childhood, Noblin “pretty much stuck to himself as far as his business was concerned” and “made up his own mind.” Joe Rigby, a friend of Burgess’s, testified that Noblin “was [the] kind of person that stayed to himself and took care of Bob.” As contestant Boykin put it, Noblin had garnered the nickname — “one way Bob.”
 

 ¶ 26. According to McDill and Burgess, this independence extended to financial matters as well. Although we find no specific proof of what Noblin knew of his total assets, the testimony of Burgess and McDill supports that Noblin took care of his own finances. Both Burgess and McDill asserted they did not own a joint account with Noblin or assist Noblin in writing checks.
 

 ¶ 27. There is little or no proof to show Noblin either did or did not understand who his intestate heirs were. Also, no prior wills existed for the subject will to effect.
 

 3. Independent Consent and Action
 

 ¶ 28. Again, other than inferences that might be drawn from the procurement of the will, especially from Burgess’s telephone call to Sorey, the evidence points to the fact that Noblin exercised his own independent consent and action with regard to the making of the will and its terms. Callum’s testimony, as a disinterested person, is of course very significant on this factor. Callum testified to the following:
 

 Q: Okay. Once you walked into the room, did you have any conversations with Mr. Noblin?
 

 A: I don’t remember the exact words or exact conversation that I had with Mr. Noblin, but I did have a conversation with him, yes.
 

 Q: Okay, what were your conversations about?
 

 A: I’m sure the usual exchanges of, you know, hey, Mr. Noblin, how are you doing, that kind of thing took place originally; and then, you know, verifying that what was taking place was what he wanted to do.
 

 Q: Okay. And did you satisfy yourself that that’s what he wanted to do?
 

 A: I did, through the questions that I asked him, yes.
 

 Callum remained in the room for approximately thirty minutes during the execution of the will. During cross-examination, Callum added, “I’m not going to sign my name to any document that I feel is deceitful. I read the will[,] and I made my own judgment based on the questions that I asked Mr. Noblin.” After reading the will, remaining in the room for half an hour, and having a conversation with Noblin, Callum “satisfied [herself] knowing that [she] was doing what Mr. Noblin wanted done.” She then observed Noblin sign his will.
 

 ¶ 29. Under these circumstances, we find a factual question on which reasonable minds could differ. The trial court did not err in refusing to hold the presumption of undue influence could not be overcome as a matter of law. The trial court properly submitted this issue to the jury.
 

 II. Testamentary Capacity
 

 ¶ 30. The trial judge granted a directed verdict on testamentary capacity, finding Noblin possessed the requisite capacity to
 
 *291
 
 make a will. The judge later granted a peremptory instruction to that effect. The contestants argue reasonable minds could differ over the question of whether the testator had capacity. They contend this issue should have been submitted to the jury.
 

 ¶ 31. We review de novo the trial court’s grant or denial of motion for a directed verdict.
 
 Solanki,
 
 21 So.3d at 557 (¶ 10). The applicable standard of review is as follows:
 

 In deciding whether a directed verdict should be granted, the trial judge is to look solely to the testimony on behalf of the party against whom a directed verdict is requested. He will take such testimony as true along with all reasonable inferences which can be drawn from that testimony which is favorable to that party, and, if it could support a verdict for that party, the directed verdict should not be given. If reasonable minds might differ as to this question, it becomes a jury issue.
 

 Id.
 
 at 556 (¶ 8). The same standard applies to ruling on a peremptory instruction.
 
 Id.
 
 at 557 (¶ 10).
 

 ¶ 32. For a will to be valid, the testator must possess testamentary capacity. For testamentary capacity to be present, the testator must be of “sound and disposing mind” at the time of the will’s execution. Miss.Code Ann. § 91-5-1 (Rev.2004);
 
 In re Estate of Edwards v. Edwards,
 
 520 So.2d 1370, 1372 (Miss.1988); Weems, at § 4:3.
 
 [7]
 
 The requirement of a sound and disposing mind does not mean the testator’s mind must be as good as it ever was. Weems, at § 4:3. Rather, the relevant test centers on the time the will is executed. At that time, the testator must: “understand and appreciate the nature and effect of his act [of making a will,] the natural objects or persons to receive his bounty and their relation to him, and [be] able to determine what disposition he desires to make of his property.”
 
 In re Estate of Mask v. Elrod,
 
 703 So.2d 852, 856 (¶ 17) (Miss.1997).
 

 ¶ 33. Our supreme court has explained the burden of proof on the issue of testamentary capacity as follows:
 

 The proponents of the will meet their burden of proof by the offering and receipt of the will into evidence and the record of probate. The proponents make a prima facie case solely on this proof. The burden then shifts to the contestants to overcome the prima facie case, but the burden of proof remains with the proponents to show by a preponderance of evidence that the testator had capacity.
 

 Estate of Holmes,
 
 961 So.2d at 679-80 (¶ 13) (internal citations omitted). Here, the proponents offered the will, subscribing witness affidavits, and the record of probate into evidence. Thus, a prima facie case of testamentary capacity arose, shifting the burden to the contestants.
 

 ¶ 34. To support their argument on this issue, contestants direct our attention to the notes of Dr. Grace Shoemaker, Noblin’s oncologist. These notes indicate Noblin was “lethargic” and “jaundiced” on October 2 — the date Noblin signed the will. They also point to testimony that Noblin had been given pain medicine off and on during his stay at Baptist Hospital and that he did not eat on October 1 or 2. The contestants also rely on nursing notes, taken in the two days before the will was signed, which indicate that Noblin halluci
 
 *292
 
 nated and heard voices after receiving medication.
 

 ¶ 35. Dr. Shoemaker testified “lethargic” means “sleepy, decreased level of consciousness.” She testified her October 2 entry would have been made between 8 a.m. and 9 a.m. Nurse’s notes taken on the morning of October 2 at 7:45 a.m. indicate Noblin was “[v]ery lethargic” but “[e]asily aroused.” According to Dr. Shoemaker, “easily aroused” means “with any kind of stimulus, either talking to them or touching ... them, they [would] wake up and ... respond to you.” Although Noblin was lethargic, Dr. Shoemaker explained, he would “wake up and talk” when stimulated. In addition, when asked whether a lethargic person can continue to conduct their own business, Dr. Shoemaker responded: “There are lots of degrees of lethargy, yes.” When asked directly about whether Noblin was of sound mind when the will was made, Dr. Shoemaker did not make an assessment. The following exchange occurred:
 

 Q: Okay. And as far as Bob Noblin’s mental status between the hours of 12:00 noon and 2:00 in the afternoon, are you able to give an opinion based upon a reasonable degree of medical probability as to whether or not Mr. Noblin was mentally able to understand and appreciate what he was doing and signing?
 

 A: I’m not sure what date you’re talking about. But my memory of that, completely, I’d have to rely on what I’ve written in the record.
 

 Q: Okay. And would you also rely on what a nurse, as far as the nurse’s assessment of the patient?
 

 A: I would rely on a nurse’s ability to assess that, yes.
 

 Q: Well, what about — you indicated you recall Ms. Corley Callum.
 

 A: Vaguely.
 

 Q: Okay. Would you rely on her assessment?
 

 A: I assume I would, yes.
 

 ¶ 36. This Court addressed a similar factual scenario in
 
 In re Estate of Pigg v. McClendon,
 
 877 So.2d 406 (Miss.Ct.App.2003). In
 
 Estate of Pigg,
 
 this Court reversed a trial court’s decision to submit the issue of testamentary capacity to the jury.
 
 Id.
 
 at 411 (¶ 23). The testatrix executed her will on April 10, 1997, leaving all her property to siblings and half-blood siblings but making no provision for one of the contestants, her brother.
 
 Id.
 
 at 408-09 (¶¶ 2-4). One witness testified by deposition that the testatrix had experienced hallucinations during the month of April, slightly over one week prior to executing the will.
 
 Id.
 
 at 410 (¶ 14). In addition, the testatrix’s treating physician, who saw her both the day before (April 9) and the day after (April 11) she executed the will, testified that “someone who had that many multiple problems, certainly they felt bad, and I’m not sure that they would be thinking rationally. I’m thinking in general terms.”
 
 Id.
 
 at (¶ 15). However, Judge Southwick writing for this Court pointed out her physician did not have any record of seeing her on April 10 — the date she executed the will — and offered no opinion on her mental status on that date.
 
 Id.
 
 at (¶ 16).
 

 ¶ 37. On the other hand, two witnesses — one being the attorney who drafted the will and the other being the attorney’s wife who occasionally worked in her husband’s law office — testified at trial that they witnessed the will’s execution. Both acknowledged the testatrix appeared to be in physical discomfort the morning she signed the will.
 
 Id.
 
 at 410-11 (¶ 20). But they further testified they went over the dispositive paragraphs of the will with her,
 
 *293
 
 and she responded to questions appropriately.
 
 Id.
 
 at 411 (¶ 20).
 

 ¶ 38. The trial judge submitted the issue of testamentary capacity to the jury, which this Court found to be reversible error under these circumstances.
 
 Id.
 
 at (¶ 23). In reaching this decision, the Court noted: “At the close of their case, the contestants had produced no evidence that [the testatrix] failed to have sufficient mental capacity on the critical date of April 10, 1997.”
 
 Id.
 
 at 410 (¶ 18). This Court emphasized the importance of testimony of the attesting witnesses regarding the testatrix’s responsiveness on the date in question, and the fact that the testatrix made a natural disposition of her property.
 
 Id.
 
 at 411 (¶ 22).
 

 ¶ 39. In another instructive case,
 
 Hayward v. Hayward,
 
 299 So.2d 207, 210-11 (Miss.1974), our supreme court likewise reversed the trial court’s decision to submit the issue of testamentary capacity to the jury. In
 
 Hayward,
 
 when the testator executed his will on May 15, 1970, he was elderly, almost totally deaf and blind, in poor physical condition, and suffering from arteriosclerosis.
 
 Id.
 
 at 207. The contestants alleged the testator lacked capacity to make a will. As support, they offered the testimony of two doctors and several lay witnesses.
 
 Id.
 
 at 208. One of the doctors, who had treated the testator in 1969, testified that he had seemed “lethargic” and had “no appetite.”
 
 Id.
 
 The physician opined “it was unlikely that Hayward would have had ‘testamentary capacity’ on the date of the execution of the will[.]”
 
 Id.
 
 Based on the testator’s arteriosclerosis, the physician explained he “wouldn’t ‘expect’ [the testator] to have had ‘testamentary capacity.’”
 
 Id.
 
 A second physician, who had been the testator’s family physician for around twenty-five years, had seen the testator 4 or 5 times from 1968 to 1970.
 
 Id.
 
 This physician testified: “ T have an opinion, but this is not a fact. I do not think [the testator] was mentally competent” at the time he executed the will.
 
 Id.
 
 The basis for this assessment also focused on the testator’s arteriosclerosis.
 
 Id.
 
 However, the family physician did not see the testator on the date of the will’s execution.
 
 Id.
 
 Finally, several lay witnesses testified that, due to the testator’s severe blindness and deafness, he often failed to recognize people unless they were very close to him, and he often had extreme difficulty communicating with people.
 
 Id.
 

 ¶ 40. To rebut the contestants’ witnesses, the proponents offered several witnesses who claimed the testator was of sound mind when executing the will.
 
 Id.
 
 at 209. The attorney who drafted the will “testified unequivocally that the testator was fully aware of the natural objects of his bounty ... and knew the nature and extent of the property owned by him.”
 
 Id.
 
 The attorney also claimed “the provisions incorporated in the [will] were given to him by [the testator] who instructed him as to how he wished to leave his property.”
 
 Id.
 
 The attorney testified that after he drafted the will, the testator read the will and expressed that it memorialized his wishes.
 
 Id.
 

 ¶ 41. The supreme court, quoting a previous decision favorably, emphasized the significance of “the crucial moment when evidence of testamentary capacity attains its maximum and controlling relevancy, that is, ... the time of the will’s execution.”
 
 Id.
 
 at 209-10 (quoting
 
 Ward v. Ward,
 
 203 Miss. 32, 37, 33 So.2d 294, 295 (1948)). The
 
 Hayward
 
 court held:
 

 We have concluded ... that the evidence offered as tending to establish a lack of testamentary capacity ... amounts to no more than a scintilla and is wholly incapable of supporting the charge. It was error for the chancellor to submit to the jury the issue [of] testa
 
 *294
 
 mentary capacity[,] and [the proponents’] request for a directed verdict on that issue ... should have been granted.
 

 Id.
 
 at 210-11.
 

 ¶ 42. In the present case, just as in
 
 Estate of Pigg
 
 and
 
 Hayward,
 
 only the proponents presented probative evidence of testamentary capacity at the precise time the will was executed. Callum’s testimony is highly probative of the testator’s mental capacity at this critical time. We have discussed Callum’s testimony at length and do not repeat it here, except to add the following exchange:
 

 Q: Now, [in] the affidavit ... paragraph three claims that ... Noblin was then and there of sound and disposing mind and memory. Were you satisfied with that statement before you signed the affidavit?
 

 A: I was.
 

 Q: And what did you base that upon?
 

 A: Through conversations I had with Mr. Noblin that day.
 

 Q: And you don’t recall the specifics of the conversation?
 

 A: I do not.
 

 Q: As a nurse in the oncology department, is that something that you would regularly do, is to check the mental status of a patient?
 

 A: I would say absolutely. Any time you encounter a patient, you assess their mental status.
 

 Q: Okay. And you satisfied yourself that Mr. Noblin was of sound and disposing mind?
 

 A: I was satisfied or I would not have signed my name.
 

 ¶ 43. We recognize the importance of the supreme court’s instruction that: “[Tjestimony of subscribing witnesses is entitled to greater weight than the testimony of witnesses who were not present at the time of the will’s execution or did not see the testator on the day of the will’s execution.”
 
 Estate of Edwards,
 
 520 So.2d at 1373. Further, “the subscribing witnesses to a will may testify as experts on the question of testamentary capacity.” Id.
 

 ¶ 44. Here, Callum, the only subscribing witness who testified, maintained that Noblin had capacity at the critical time he executed the will. Her testimony is supported by other witnesses as well, including McDill, who testified that Noblin put on his glasses and read the will before signing it. We further note that Noblin’s will reflected a natural disposition of his property to his stepson and stepdaughter, whom the record indicates he considered to be his own children, though he never adopted them.
 

 ¶ 45. The contestants claim the evidence of Noblin being lethargic, jaundiced, on medication, and allegedly hallucinating and hearing voices on days prior to signing the will created a jury question on the issue of testamentary capacity. Similar contentions were raised in
 
 Estate of Pigg
 
 and
 
 Hayward.
 
 And in both cases, the trial court committed reversible error by submitting the issue of testamentary capacity to the jury based upon unsubstantiated inference, where the attesting witnesses indicated the testator had capacity at the crucial and controlling moment of the will’s execution. We find the contestants’ proof insufficient to create a jury issue about the testator’s capacity to make a will at the critical time of execution.
 
 [8]
 
 
 *295
 
 Therefore, the trial court properly granted a directed verdict and later a peremptory instruction in favor of the proponents on this issue.
 

 III. Peremptory Instruction
 

 ¶46. At trial, counsel for the contestants submitted proposed jury instruction C-9 — a peremptory instruction directing the jury to find a confidential relationship existed between the testator and the proponents. The trial judge denied the peremptory instruction. The contestants argue the instructions given by the trial judge impermissibly permitted the jury to determine whether a confidential relationship existed, when, they contend, a confidential relationship was established as a matter of law. The proponents respond that the jury instructions taken as a whole fairly announced the law and created no injustice, and any error in the denial of the peremptory instruction is harmless.
 

 ¶ 47. We review de novo the trial court’s grant or denial of a request for a peremptory instruction.
 
 Solanki,
 
 21 So.3d at 557 (¶ 10). The following standard is the same for reviewing the trial court’s ruling on a motion for a directed verdict:
 

 The rule for determining whether a peremptory instruction is appropriate requires that all evidence favorable to the party against whom the peremptory instruction is requested must be accepted as true, all evidence in favor of the party requesting the peremptory instruction in conflict with that of the other party must be disregarded, and, if the evidence and the reasonable inferences to be drawn from same will support a verdict for the party against whom it is requested, then the peremptory instruction should be refused.
 

 In re Last Will and Testament of Dickey v. Dickey,
 
 542 So.2d 903, 904 (Miss.1989).
 

 ¶ 48. Here, as the parties point out, the trial judge initially informed the attorneys, outside of the presence of the jury, that:
 

 Clearly the active participation by the beneficiaries in the procurement, preparation and delivery of the will, to which the proponents testified themselves, fits squarely within the definition of a confidential relationship as defined in the jury instructions submitted by the proponents] and the contestants].... Such actions seem to invite a will contest, but whether the actions of the proponents are sufficient to support a verdict of undue influence remains to be seen.
 

 Nevertheless, it appears he later changed his mind and denied instruction C-9, which stated: “The Court instructs the jury that you shall find that a confidential relationship existed between the testator ... and the proponents!.]”
 

 ¶ 49. The initial matter that we must consider is the fact that counsel for the proponents conceded, albeit with some hesitation, after questioning at oral argument before this Court that a confidential relationship existed. We are certainly wary of resting our decision on a concession made during appeal, which we ultimately determine is not supported by the record. Although matters stipulated at trial are procedurally barred from being appealed, see
 
 State ex rel. Holmes v. Griffin,
 
 667 So.2d 1319, 1327 (Miss.1995), this issue was not stipulated at trial. The fact remains that the trial judge considered conflicting evidence on the existence of a confidential relationship. The concession aside, we find the trial court ultimately arrived at the correct decision to submit the issue to the jury.
 

 ¶ 50. Our supreme court has described a confidential relationship as one where “a fiduciary relation exists as a fact, in which there is a confidence reposed on one side
 
 *296
 
 and the resulting superiority and influence on the other.”
 
 Davion v. Williams,
 
 352 So.2d 804, 807 (Miss.1977) (quoting
 
 Croft,
 
 237 Miss. at 725, 115 So.2d at 687);
 
 see also Estate of Laughter,
 
 23 So.3d at 1063 (¶ 31) (A confidential relationship is present where “one person is in a position to exercise dominant influence upon the other because of the latter’s dependency on the former arising either from weakness of mind or body, or through trust.”);
 
 Taylor v. Welch,
 
 609 So.2d 1225, 1231-32 (Miss.1992) (“In order for a litigant to prove a confidential or fiduciary relationship from which undue influence arises, the relationship must reflect ‘a dominant, overmastering influence which controls over a dependent person or trust justifiably reposed.’ ”);
 
 Norris v. Norris,
 
 498 So.2d 809, 812-13 (Miss.1986) (“[A] confidential relationship is not confined to any specific association of persons but arises any time there appears on the one side an overmastering influence or, on the other, weakness, dependence, or trust, justifiably reposed.”). The supreme court has also held that “[t]he basis of this relationship need not be legal; it may be moral, domestic, or personal.”
 
 Hendricks v. James,
 
 421 So.2d 1031, 1041 (Miss.1982).
 

 ¶ 51. It is well settled that “the burden of establishing the existence of a confidential relationship lies with the party asserting it” — the contestants.
 
 In re Will and Testament of Launius v. Warden,
 
 507 So.2d 27, 31 (Miss.1987). The contestants must show that a confidential relationship existed at the time the will was executed by clear and convincing evidence.
 
 In re Will and Testament of Boyles v. Tadlock,
 
 990 So.2d 230, 236 (¶ 22) (Miss.Ct.App.2008). The following factors should be considered in assessing the existence of a confidential relationship:
 

 (1) whether one person has to be taken care of by others, (2) whether one person maintains a close relationship with another, (3) whether one person is provided transportation and has their medical care provided for by another, (4) whether one person maintains joint accounts with another, (5) whether one is physically or mentally weak, (6) whether one is of advanced age or poor health, and (7) whether there exists a power of attorney between the one and another.
 

 Estate of Dabney,
 
 740 So.2d at 919 (¶ 12). If reasonable minds can differ over the existence of a confidential relationship, the question is one for the jury.
 
 Davion,
 
 352 So.2d at 807-08.
 

 ¶ 52. In the context an inter vivos transfer, the supreme court has held that “a familial relationship is not intrinsically one of confidence.”
 
 Foster v. Ross,
 
 804 So.2d 1018, 1023 (¶17) (Miss.2002). In this same vein, we have stated: “[A] deed from a parent to a child alone and of itself raises no presumption of undue influence since, in the absence of evidence to the contrary, the parent is presumably the dominant party. This is true even though the parent is aged, or aged and infirm.”
 
 In re Estate of Summerlin v. Summerlin,
 
 989 So.2d 466, 477 (¶ 37) (Miss.Ct.App.2008). Here, we are guided by these principles, given that the relationship between Noblin and his stepchildren was in essence a parent/child relationship, as evidenced by his IRA applications completed in 1989 wherein he referenced them as his “son” and “daughter.” Even the tombstone purchased by Noblin in 1994 had the word “father” inscribed above Noblin’s name. Noblin had no natural children of his own and could only have been referencing his relationship with his stepchildren. Further, Sorey testified Noblin told him Burgess and McDill were his “son” and “daughter.”
 

 ¶ 53. In
 
 Davion,
 
 the supreme court found reversible error in peremptorily in
 
 *297
 
 structing the jury to find the existence of a confidential relationship, where the question was one over which reasonable minds could differ.
 
 Davion,
 
 352 So.2d at 807-08. There, the testatrix executed two wills purporting to be her last will and testament.
 
 Id.
 
 at 805-06. The first will left the testatrix’s entire estate to her brother.
 
 Id.
 
 The second will left her entire estate to her neighbor.
 
 Id.
 
 at 806. The brother sought to probate the first will, which the neighbor contested on the ground that it had been revoked by the second will.
 
 Id.
 
 at 805. The brother answered, arguing the latter will was the product of undue influence.
 
 Id.
 
 After the close of the evidence, the trial court granted two instructions, peremptory in character, placing the burden of proof on the neighbor to show by clear and convincing evidence that the second will was not the product of undue influence.
 
 Id.
 
 at 806-07. The peremptory instructions assumed that a confidential relationship was present with regard to the second will.
 
 Id.
 
 The sole issue on appeal was whether the trial court committed reversible error in not submitting the issue of the existence of a confidential relationship between the testatrix and the neighbor to the jury.
 

 ¶ 54. The neighbor, who stood as the contestant of the first will but the proponent of the second, lived next door to the testatrix for many years and was a close personal friend to her.
 
 Id.
 
 at 806. The brother lived “a good distance away” in another state.
 
 Id.
 
 The neighbor went to the office of the lawyer who drafted the will and provided some of the details to put into the will.
 
 Id.
 
 Around six days after the second will was drafted, the testatrix placed the neighbor’s family’s names on her checking account so that they could attend to her business if anything happened to her, according to a bank official.
 
 Id.
 
 However, multiple witnesses testified to the testatrix’s strong-willed nature.
 
 Id.
 
 Furthermore, the evidence was clear that “on the occasion of the execution of the second [w]ill, she was under no disability and no misapprehensions, but that her mind was clear and that she had control of all of her faculties and knew exactly what she wanted to do concerning her property[.]”
 
 Id.
 
 Given the conflicting evidence, the supreme court found the trial court’s failure to submit the issue of the existence of a confidential relationship to the jury was reversible error, reasoning:
 

 In the present case, concerning a relationship between neighbors, given the testimony as to the strong[-]willed nature of [the testatrix], her independent execution of the [w]ill, and testimony at least indicating the beneficiary occupied a subservient role in the relationship; it must be held that a question arose particularly suitable for determination by a jury.
 

 Id.
 
 at 808.
 

 ¶ 55. Here, we reiterate that the contestants were required to show by clear and convincing evidence the existence of a dominant, overmastering influence on the part of the beneficiaries over the testator.
 
 Taylor,
 
 609 So.2d at 1231-32;
 
 Will and Testament of Boyles,
 
 990 So.2d at 286 (¶ 22). If reasonable minds could differ over whether this showing has been made, the trial court must submit the issue to the jury.
 
 Davion,
 
 352 So.2d at 807-08. While we certainly agree under the unusual fact of this case that there was evidence of such a dominant influence, we cannot ignore the evidence supporting the opposite proposition. No less than eight witnesses, including three of the contestants, testified to Noblin’s independent nature. Much of this testimony centered on his insuscepti-bility to be influenced by others in his decision making and his practice of tending to his own business and financial affairs. We also cannot ignore Callum’s testimony
 
 *298
 
 as a disinterested witness that Noblin’s will reflected his wishes. Although doctor’s and nurse’s notes tended to show Noblin’s mental weakness soon before the will’s execution, Callum’s testimony certainly supported the opposite at the critical time of the will’s execution. And her testimony was uncontradicted on this point. Furthermore, the contestants presented no evidence that Noblin maintained any joint account with another person or that there existed any power of attorney between him and another person.
 

 ¶ 56. Under these facts, we conclude the contestants failed to establish the existence of a confidential relationship by clear and convincing evidence as a matter of law. Due to conflicting evidence on this issue, we find reasonable minds could differ over whether a confidential relationship existed between Noblin and Burgess and McDill. Therefore, we find no error in the trial court’s submission of this issue to the jury.
 

 ¶ 57. Accordingly, we affirm the judgment of the trial court.
 

 ¶ 58. THE JUDGMENT OF THE SMITH COUNTY CIRCUIT COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.
 

 KING, C.J., LEE AND MYERS, P.JJ, GRIFFIS, BARNES, ISHEE AND ROBERTS, JJ., CONCUR. IRVING AND CARLTON, JJ., NOT PARTICIPATING.
 

 [1]
 

 . The contestants comprise seven of Noblin's twenty-one or more heirs at law.
 

 [2]
 

 .
 
 See generally
 
 Robert A. Weems,
 
 Wills and Administration of Estates in Mississippi
 
 § 1:9 (3rd ed. 2003).
 

 [3]
 

 . At the time, Burgess was living with Noblin and had been for about two years. Burgess testified that he had moved in with his stepfather because Burgess had just gotten divorced.
 

 [4]
 

 .Sorey readily conceded that he would have preferred to have met with Noblin personally, but explained that a personal meeting never took place because he was leaving town the afternoon of October 1, 2003.
 

 [5]
 

 . We note that Mississippi’s chancery courts have full jurisdiction over "matters testamentary and of administration.”
 
 In re Estate of Hathorne v. Griffin,
 
 987 So.2d 486, 489 (¶ 13) (Miss.Ct.App.2008) (quoting Miss. Const. art. 6, § 159). Although subject-matter jurisdiction was proper in the chancery court, neither party has taken issue with the circuit court's lack of jurisdiction. But even if either party complained on this ground, article 6, section 147 of the Mississippi Constitution prohibits reversal of a circuit or chancery judgment solely on the ground of either court’s lack of subject-matter jurisdiction.
 
 See also Tillotson v. Anders,
 
 551 So.2d 212, 215 (Miss.1989). Therefore, absent some other error, we need not visit this issue.
 

 [6]
 

 . Though “the testimony of the proponents or interested parties is not sufficient to rebut the presumption of undue influence,”
 
 In re Estate of Holmes,
 
 961 So.2d 674, 681 (¶ 19) (Miss.2007), we note that Callum had no interest in the will.
 

 [7]
 

 . The testator must also be of sufficient age to possess testamentary capacity.
 
 See
 
 Miss.Code Ann. § 91-5-1 (Rev.2004).
 

 [8]
 

 . The contestants also claim Noblin’s signature on the will did not match a signature on a September 29 hospital record. However, the contestants have not made a sufficient showing that the signature on the hospital record was Noblin's. We find this allegation insufficient to create a jury question as well.