MODIFIED OPINION ON MOTION FOR REHEARING
GRIFFIS, J.,
for the Court.
¶ 1. The motion for rehearing is denied. The original opinion is withdrawn and this opinion is substituted.
¶ 2. This is an appeal from a will contest from the Chancery Court of Jackson County. The chancellor found that Ola McQueen, the decedent, had testamentary capacity to execute a will on April 24, 2001. The chancellor further found that McQueen was not the subject of any undue influence, and therefore, the will dated April 24, 2001, was the valid last will and testament of the decedent. The proponents of the 2001 Will were David Anthony Sims, Brian Wayne Sims, Jason Michael Sims, Kirsten Michelle Sims, and Rocky Alan Rocco. The contestant, Dianne Lynn Rocco, granddaughter of the decedent, appeals the chancellor’s decision.
FACTS
¶ 3. Ola McQueen died on May 8, 2001, at the age of eighty-one. McQueen was predeceased by her husband and both of her daughters. Her grandchildren, David Sims and Diane Rocco, were her heirs-at-law.
¶ 4. Prior to April of 2001, McQueen lived alone. According to the testimony of her family and friends, she was independent and strong-willed until her health deteriorated. McQueen was diagnosed with terminal liver cancer in March of 2001. Until her illness worsened, McQueen tended to her own business affairs. McQueen paid her bills, except for a few bills paid by David Sims immediately before her death, and essentially controlled all of her finances.
¶ 5. After a severe fall in April of 2001, McQueen was unable to move around with ease and required additional care. Various family members provided her with transportation, medical care, and they sometimes cooked for her. It was during the final months of her life that McQueen expressed a desire to “get her affairs in order.”
¶ 6. McQueen executed a second will on April 24, 2001. David Sims, McQueen’s grandson, secured the necessary attesting witnesses, the notary, and the attorney. Along with Sims, McQueen’s neighbors of twenty years, Phillip and Patricia Levine, were present for the execution serving as witnesses. The will was notarized that same morning by Wanda Davis.
¶ 7. Prior to the 2001 Will, McQueen had executed a will dated July 2, 1982. The 1982 Will distributed both her real and personal property among David Sims, Dianne Rocco, Brian Sims, and McQueen’s *867 daughter Frances, who subsequently-passed away. The most notable difference between the wills is the amount of land distributed. The 1982 Will left a larger tract of land to Rocco and a smaller tract of land to Sims. The 1982 Will devised 4.5 to 5.0 acres of land to Sims while under the 2001 Will, Sims received 17.5 acres of land.
¶ 8. Ola McQueen died on May 8, 2001. On June 1, 2001, David Sims filed a complaint to admit the 2001 Will to probate. A judgment admitting the 2001 Will to probate was executed on June 13, 2001. Sims was issued letters of testamentary on June 14, 2001, to Sims.
¶ 9. On June 18, 2001, Diane Rocco filed a petition to contest the will. She alleged that the 2001 Will was not valid and that McQueen was not of sound and disposing mind and memory on April 24, 2001, the day on which the 2001 Will was executed. Therefore, Rocco asserted that McQueen did not have testamentary capacity to execute the will. Rocco also claimed that the 2001 Will was a product of undue influence, by Sims, and that the 1982 Will should be probated instead.
¶ 10. A trial was held on May 20, 2002, November 5, 2002, and concluded on February 14, 2003. During the trial, the chancellor heard the testimony of thirteen witnesses and filed a detailed opinion. The chancellor ruled that (1) Ola McQueen had full knowledge and deliberation in the execution of the 2001 Will, (2) the 2001 Will fairly and accurately represented the distribution intentions of McQueen, (3) David Sims had, by clear and convincing evidence, overcome the presumption of undue influence, and (4) the 2001 Will of Ola McQueen was legal and binding.
STANDARD OF REVIEW
¶ 11. When reviewing a will contest, it has long been established that chancellors have broad discretion and their findings will only be disturbed if these actions were manifestly wrong, constituted an abuse of discretion, or represented the application of an erroneous legal standard. Estate of Grantham v. Roberts, 609 So.2d 1220, 1223 (Miss.1992). Even where the reviewing court disagrees with the findings of fact of the trial court, it should not substitute its judgment for that of the chancellor. Owen v. Owen, 798 So.2d 394, 397-98 (¶ 10) (Miss.2001). When a chancellor’s findings are supported by substantial, credible evidence, a reversal will not be warranted. Estate of Grubbs, 753 So.2d 1043, 1046 (¶ 7) (Miss.2000).
ANALYSIS

I. Did the chancellor err in finding that the decedent was not the subject of undue influence in the making of the will?

¶ 12. Dianne Rocco asserts that Ola McQueen was unduly influenced by David Sims when McQueen executed the 2001 Will. Rocco argues that there was a confidential relationship between Sims and McQueen. In this appeal, Rocco claims that the proponents of the will failed to prove by clear and convincing evidence that McQueen was not unduly influenced by Sims.
¶ 13. At trial, Sims introduced the 2001 Will and the judgment admitting the will to probate establishing a prima facie case for the validity of the 2001 Will. In re Estate of Smith, 722 So.2d 606, 610 (¶ 13) (Miss.1998); Matter of Estate of Edwards, 520 So.2d 1370, 1372-73 (Miss. 1988). However, there is a presumption of undue influence where there is a bequest by a testatrix to one in a fiduciary relationship with her, if the fiduciary has any involvement in the preparation of the will. Smith, 722 So.2d at 611 (¶ 18). The chan *868 cellor found a fiduciary relationship between McQueen and Sims and referred to the following evidence. McQueen’s bank account was in the name of both she and David Sims. David Sims wrote checks on the account for the benefit of McQueen. David Sims had power of attorney for health care for McQueen. After McQueen’s fall in April of 2001, David Sims would stay overnight at her home to assist her with physical and medical needs. McQueen was dependant on Sims for administering her medication. David Sims arranged for the preparation of the 2001 will by securing the witnesses, the notary and the attorney.
¶ 14. The chancellor correctly determined that a fiduciary relationship existed between Sims and McQueen. Sims’ active participation in the preparation of the 2001 Will established a presumption of undue influence. We now consider whether Sims presented clear and convincing evidence to overcome the presumption of undue influence.
¶ 15. To overcome the presumption of undue influence, Sims was required to prove the following by clear and convincing evidence:
1. The beneficiaries must have acted in good faith.
a. Who initiated the procurement of a will?
b. Where was the will executed and in whose presence?
c. What consideration was paid?
d. Who paid the consideration?
e. Was there secrecy or openness in the execution?
2. The testatrix must have had full knowledge and deliberation in the execution.
a.Was the testatrix aware of her total assets and their general value?
b. Did the testatrix understand who her natural inheritors were?
c. Did the testatrix understand how the change would legally effect prior wills?
d. Did the testatrix know that non-relative beneficiaries would be included?
e. Did the testatrix know who controlled her finances and by what method?
1. How dependent is the testatrix on those handling her finances?
2. How susceptible is she to influence by those handling her finances?
3.The testatrix must have exhibited independent consent and action.
Id. at 612 (¶ 22) (Miss.1998).
¶ 16. The chancellor found that David Sims had overcome the presumption of undue influence. The chancellor determined that: (1) there was good faith on the part of David Sims, (2) Ola McQueen initiated the procurement of the 2001 Will, (3) David Sims was present during the execution of the 2001 Will, (4) no consideration was paid for the 2001 Will, (5) there was no secrecy involved in the execution of the 2001 Will, (6) McQueen knew of the total assets of her estate and their general value, (7) McQueen knew the identity of her natural inheritors, (8) McQueen controlled her finances, (9) McQueen was not susceptible to those handling her finances, and (10) McQueen exhibited independent actions in all of her affairs. The chancellor ruled:
It is the duty of the Court to see that the testatrix’s property be distributed as she had intended it to be distributed. Further, it is the opinion of the Court that the 2001 Will fairly and accurately represents the distribution intentions of the testatrix herein, and at it’s (sic) exe *869 cution, Ola had full knowledge and deliberation in the execution of the 2001 Will.
¶ 17. We review the chancellor’s findings. David Sims must first establish that he acted in good faith. It is clear from the record that Ola McQueen initiated the procurement of the 2001 Will. McQueen contacted Gary Durbin and requested a survey of her land to obtain an accurate description of the property in order to prepare her will. McQueen met with Durbin to discuss the division of her property on April 10, 2001. McQueen was not accompanied by Sims, nor any family member. McQueen gave a copy of the deed to the property to Durbin. McQueen further instructed Durbin and his assistants that should any property line dispute arise, she should be consulted first,
¶ 18. Additional evidence exists supporting the finding that McQueen initiated the procurement of the 2001 Will. McQueen made a lengthy and detailed list, in her handwriting, of the personal property to be included in the 2001 Will. Also, Jason Sims testified that he heard McQueen arguing with David Sims about getting her papers signed. Sims clarified, in his testimony, that the “papers” that McQueen was referring to was the 2001 Will.
¶ 19. Finally, the 2001 Will was not executed in secret, but rather in the open. To overcome the “secrecy issue” it must only be shown that the witnesses knew that a will was being executed. In re Estate of Smith, 827 So.2d 673, 680 (Miss.2002). The 2001 Will was executed in Ola McQueen’s home in front of the two attesting witnesses. Phillip Levine, an attesting witness, testified that McQueen read and signed the 2001 Will in his presence. We agree with the chancellor’s finding that the evidence clearly proved the good faith of Sims.
¶ 20. Only two facts weigh in favor of Rocco instead of Sims. First, Sims was present at the execution of the 2001 Will. Although the attorney and attesting witnesses were also present, we generally disfavor the presence of a beneficiary during the execution of the benefitting will. Last, there was no consideration given for the attorney’s services. The attorney acted upon a favor to Sims and did not charge' for his services. Though these facts do not favor Sims, they are insufficient to establish a lack of good faith.
¶ 21. The second prong of the undue influence test requires consideration of the grantor’s knowledge and deliberation in executing the will at issue. We evaluate McQueen’s deliberation of the 2001 Will in four specific categories.
¶ 22. We must first examine McQueen’s knowledge regarding the total value of her assets. McQueen gave instructions as to where the boundary lines of her property were located as well as the structures affixed to her property. As stated previously, in her own hand, McQueen wrote an extensive and detailed list of her personal property to be distributed. Furthermore, the property bequeathed in the 2001 Will was the same as that of the 1982 Will with the only difference being the amount of land distributed. We agree with the chancellor that McQueen was well aware of the total value of her assets.
¶ 23. We next examine whether McQueen was fully aware of the identity of her natural inheritors. There was no testimony presented to the contrary. McQueen’s gift of real property to her grandchildren, David, Diane, and Brian clearly evidence her knowledge of her heirs.
¶ 24. McQueen’s understanding of the legal effects in revoking the 1982 Will must also be considered. The 2001 Will *870 had the same beneficiaries to the real property as the 1982 Will with the sole difference being that of the size of the distribution. Durbin testified that McQueen expressed her hope that Brian Sims and Dianne Rocco would not get upset since David Sims was to receive more property in her new will. The existence of the list of personal property bequests in the 2001 Will to parties not listed in the 1982 Will further proves McQueen’s understanding. The evidence from the record, specifically her conversations with family, proves that McQueen intended to change the beneficiaries in her will.
¶ 25. Finally, we must consider whether McQueen knew how her personal finances were managed. The evidence clearly established that McQueen controlled her own finances. Family members testified that her checkbook was constantly on her kitchen counter. McQueen paid her own bills, except for the few bills paid before her death where she allowed David Sims to write checks for small amounts. There was no testimony to dispute the fact that McQueen controlled her financial affairs. McQueen was clearly not dependent on anyone to manage her finances.
¶ 26. The final prong of the undue influence test considers whether McQueen exhibited independent consent and action. McQueen made lists of her personal property, made the initial contact with the surveyor, and read and signed the 2001 Will in the presence of the two attesting witnesses. There was an abundance of testimony that McQueen was an independent, strong-willed person handling her own affairs.
¶27. Accordingly, we find that the chancellor did not err in his conclusion that Sims had overcome the presumption of undue influence. The chancellor’s analysis persuades us that he properly considered each prong of the undue influence test and found evidence sufficient to overcome the presumption by clear and convincing evidence. Ola McQueen knew how she wanted her property distributed and executed the 2001 Will on her own volition. The chancellor found that the 2001 Will fairly and accurately represented the distribution intention of McQueen and was therefore binding. Given that the chancellor was able to observe all thirteen witnesses and make his findings accordingly, we are unable to disagree. We conclude that there was no undue influence exerted on McQueen by David Sims or any other family member or friend. There was simply no evidence in the record that Sims abused his relationship with McQueen by exerting dominance over her. We therefore, find this issue is without merit.

II. Did the chancellor err in finding that the decedent had testamentary capacity to execute a will on April 21, 2001?

¶ 28. Testamentary capacity is based on three factors:
1. Did the testatrix have the ability at the time of the will to understand and appreciate the effects of her act?
2. Did the testatrix have the ability at the time of the will to understand the natural objects or persons to receive her bounty and their relation to her?
3. Was the testatrix capable of determining at the time of the will what disposition she desired to make of her property?
Gallaspy v. Gallaspy, 562 So.2d 74, 77 (Miss.1990); Matter of Estate of Edwards, 520 So.2d 1370, 1372 (Miss.1988).
¶ 29. The proponents’ burden of proof is met once the will and its record of probate is received into evidence. Ed *871 wards, 520 So.2d at 1372-73 (quoting Harris v. Sellers, 446 So.2d 1012, 1014 (Miss. 1984)). On this proof alone, a prima facie case is made. Id. at 1373. The burden of proceeding then shifts to the contestants to overcome the established prima facie case. Id. at 1373. However, though the burden of proceeding has shifted, the burden of proof remains with the proponent to show by a preponderance of the evidence that the testator had capacity. Id.
¶ 30. In considering all the evidence, some testimony will receive greater weight. The testimony of subscribing witnesses receives greater weight than the testimony of witnesses who were not present at the will’s execution. Id. at 1373. The date of execution is the most important date, given that we recognize that a testator.may not possess capacity one day and within several days have the capacity to execute a valid will. Id.
¶ 31. Rocco argues that McQueen did not have the ability to understand or appreciate the nature of her act of making a will on April 24, 2001. To support her argument, Rocco cites the pain journal’s entry, on April 24, noting McQueen’s pain level at “8” out of a possible “10.” However, this citation is misleading given that the time of this entry was 1 a.m. McQueen executed the 2001 Will at approximately 8 a.m., when her pain level was recorded as “1.” Rocco also relies on McQueen’s taking various medications for pain and anxiety as support. Rocco finally contends that McQueen’s misspelling of her name in the notary register signaled a lack of capacity.
¶ 32. The proponents of the 2001 Will offered testimony to establish McQueen’s capacity on April 24, 2001. McQueen’s deteriorating health was not contested. However, testimony from family members, witnesses, and professional care-givers consistently described McQueen as alert and aware of the consequences of executing the 2001 Will.
¶ 33. Phillip Levine was the sole attesting witness to testify. Levine testified that although McQueen’s health was failing, her mind was still good on April 24, 2001. Levine also stated that McQueen understood the document she signed. Levine further testified that McQueen described her handwriting as bad.
¶ 34. Wanda Davis, the notary, testified that she spent time with McQueen alone on April 24. Davis testified that she thoroughly questioned McQueen about the document she had signed. Davis questioned McQueen about the day of the week, the date of the month, whether she knew content of the 2001 Will, whether she read the 2001 Will before signing it, whether the 2001 Will was what she wanted, and finally whether she signed the 2001 Will of her own volition. Furthermore, Davis stressed McQueen’s insistence that Davis notarize the 2001 Will. Davis opined that McQueen was not only alert but, in complete control of the 2001 Will’s execution.
¶ 35. Finally, Debbie Eaker, a registered nurse, testified regarding her care for McQueen. Eaker visited McQueen only hours after the 2001 Will was executed.’ Eaker specifically noted her record of McQueen’s pain level being at a “1” at 2 p.m. on April 24. Eaker testified that her nurse’s note described McQueen as “alert and oriented” during the visit. We recognize that McQueen was in significant pain, but emphasize the consistent position of all witnesses that McQueen was alert and oriented on April 24, 2001.
¶ 36. We agree with the chancellor that the proponents of the 2001 Will met their burden of proof. McQueen’s testamentary capacity was clearly established by a preponderance of the evidence. On April 24, 2001, McQueen was capable of coherent communication and able to recognize all of *872 her visitors. Testimony consistently presented McQueen as knowledgeable as to the amount of property that she owned and the effects of executing the 2001 Will. The only conflicting testimony was that of Dianne Roeco, the contestant, who stood to gain considerably if the 2001 Will was declared invalid. Therefore, since Rocco could not prove that Ola McQueen was incapable of understanding the nature of the act, the persons receiving the bequests, or the disposition of her gift, we find the evidence sufficiently established that McQueen had the mental capacity to create a will on April 24, 2001. Therefore, we find that this issue lacks merit.
¶ 37. Having reviewed the record, we find there was sufficient evidence to support the chancellor’s finding that David Sims had overcome the presumption of undue influence. We also agree that Ola McQueen possessed testamentary capacity necessary to execute a valid will on April 24, 2001. Our standard of review requires that we affirm the chancellor in the absence of manifest error, abuse of discretion or error of law. Finding none here, we affirm the chancellor’s ruling admitting the 2001 Will to probate.
¶ 38. THE JUDGMENT OF THE JACKSON COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE TAXED TO THE APPELLANT.
KING, C.J., BRIDGES AND LEE, P.JJ., IRVING, MYERS, CHANDLER, BARNES AND ISHEE, JJ.