# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-CA-00398-COA

IN THE MATTER OF LEONARD ALLEN                    APPELLANT
HARVEY, DECEASED: ROBIN CHIMENTO

v.

NINA JANELLE SCHWARK, EXECUTRIX                    APPELLEE

DATE OF JUDGMENT:            03/09/2023
TRIAL JUDGE:                HON. D. NEIL HARRIS SR.
COURT FROM WHICH APPEALED:  JACKSON COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:     SCOTT CORLEW
ATTORNEY FOR APPELLEE:      E. FOLEY RANSON
NATURE OF THE CASE:         CIVIL - WILLS, TRUSTS, AND ESTATES
DISPOSITION:                AFFIRMED - 01/07/2025
MOTION FOR REHEARING FILED:

**BEFORE WILSON, P.J., WESTBROOKS AND McDONALD, JJ.**

**WESTBROOKS, J., FOR THE COURT:**

¶1.     In his last will and testament, Leonard Allen Harvey left his entire estate to his close

friend Nina Janelle Schwark. A few weeks later, he died in his home. Believing that Harvey

had no surviving heirs, Schwark filed a petition for probate. Robin Chimento and several

other family members objected to the probate and contested the will. After a bench trial, the

Jackson County Chancery Court found that Schwark overcame the presumption of revocation

and that the will was valid. On appeal, Chimento asserts five issues: (1) whether Schwark

proved testamentary capacity, (2) whether Schwark overcame the presumption of undue

influence, (3) whether the legal requirements for due execution were met, (4) whether

Schwark proved by clear and convincing evidence the legal requirements needed to probate

a lost will, and (5) whether Schwark proved that the will was lost or destroyed. Finding no error, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2.     Ernest Jenkins and Leonard Harvey were friends for over fifty years. They met at a Buick dealership in Biloxi, where Jenkins worked as a mechanic. Jenkins also worked at a body shop where Harvey spent a lot of time. The two shared a common interest and appreciation for cars.

¶3.     Jenkins' daughter, Nina Schwark, had also been very close to Harvey. Since she was a young girl, Harvey would stop by their home to visit with her father. Schwark testified:

> He spent a lot of time over there because when daddy was not working at a shop or whatever, he was working on the home, and Mr. Harvey would come over there and help him. And they would come in the yard. Daddy had his tool shop, and he was always a fixture in our lives.

Harvey did not have a wife or children, so Jenkins would also invite Harvey over for dinner, family gatherings, and holidays. Schwark testified that even as she got older and started her own family, she would continue to visit and check on Harvey.

¶4.     Schwark was a registered oncology nurse at the VA in Biloxi. In September 2014, she transferred to the Houston VA for "retirement benefits and an increase in pay." Schwark testified that before she moved, she often helped Harvey because he had a lot of health problems, and his physical condition began deteriorating. Harvey had congestive heart failure, diabetes, schizophrenia, neuropathy in his feet, and back issues that required him to wear a back brace. Schwark often stayed on Harvey about taking his heart medicine to prevent fluid buildup and swelling. She testified that she would pick up his medicine and

2

accompany him to some of his appointments at the VA. She also helped him run errands and assisted him whenever he needed help. Schwark's husband Charles and Harvey's next-door neighbor Mitchell Parker would also check on Harvey, take him to appointments, do work around Harvey's house, and run errands for him.

¶5. Parker testified that he often worried about Harvey because he was getting older. He urged Harvey several times to hire an attorney to get his affairs and estate in order. When recalling one conversation, he testified:

> I said, well, Harvey, you still need to go to an attorney and, you know, make sure everything is okay if your brother is gone. He said, well, I've got two nieces in Gulfport. But he said, they're not getting nothing. And he acted really arrogant about it, you know. And I said, Harvey you need to do something. And he said, well, they ain't never done nothing for me, they ain't never been over here. He said, I ain't giving them nothing. I'm going to give it all to Ms. Schwark. I said, well why? She's the only one that's ever come out here and took care of me.

Parker said that sometime after this conversation, Harvey added Schwark to his bank account. Harvey also began looking for someone to prepare a will for him. He asked Schwark's daughter, Christine Herring, if she had any recommendations because he knew she was a paralegal at a law firm. At trial, she revealed that she gave him a recommendation and told him which attorneys to avoid.[1]

¶6. On January 17, 2015, Harvey executed his last will and testament at the Jenkins' home. Harvey asked Herring if she could come to her grandparents' house and notarize the will. She testified, "I show up and looked at the Will and realize he needed two witnesses.

---

[1] Herring testified that she did not know who Harvey ultimately chose to prepare his will.

So there happened to be another family-friend [there]." Mark Jalanivich[2] was visiting with the Jenkins when Herring was there. She asked Jalanivich to serve as the second witness, and he agreed. In the will, Harvey declared:

> I hereby give, devise and bequeath to my friend and daughter, not by blood, but by choice, NINA JANELLE SCHWARK, my entire estate, both real and personal, of whatever kind and character, and wheresoever situated, to include all of my interest in my home or homes, the furniture and fixtures, household goods, objects of art, clothing, jewelry, automobiles, stocks and bonds, banking or investment accounts, and other like personal effects which I may own at the time of my death.

He directed that his remains be cremated and that his ashes be given to Schwark. Also, he appointed Schwark as executrix of his will. Schwark was in Houston when the will was executed. She represented that she knew nothing about the will until she came home to handle Harvey's funeral arrangements. She said that when she arrived at her parents' home, her father gave her an envelope that Harvey had dropped off for her. The envelope contained a copy of Harvey's will.

¶7. The following month, Charles and Parker had not seen Harvey for several weeks. Parker revealed that it was not uncommon to not hear from him for a few days because Harvey was a "real private person," and he often kept his phone off. However, as more time passed, Charles and Parker grew concerned. Parker decided to call the Jackson County Sheriff's Office. On February 21, 2015, deputies were dispatched to Harvey's home for a wellness check. They found Harvey deceased in his recliner in his living room. The investigative report stated, "Harvey appeared to have been deceased for several days or

---

[2] Jalanivich was the brother of Schwark's sister-in-law, Faye Jenkins. Faye was married to Schwark's brother, Earnest Jenkins.

4

weeks and was severely decomposed." Deputy Coroner Jason Moody contacted Charles to inform him that they found Harvey's body, and Charles subsequently broke the news to Schwark. At trial, Schwark testified, "as soon as . . . my husband called me and told me that they had found him, I packed my bags and headed home."

¶8. Schwark handled the funeral arrangements. She had his body sent to Southern Funeral Home to be cremated. She testified that she did not notify anyone because she believed that Harvey had no family members. She testified that the only family he ever mentioned was his older brother,[3] but that brother predeceased him. She retrieved Harvey's cell phone to see if anyone would call; however, she maintained that there were no phone calls. Schwark also claimed that she searched for documents in his home that might confirm any existing family. She testified, "I looked through a few papers at his house, but the condition of all of the papers in there, it was full of roaches and I stopped at some point."

¶9. On April 2, 2015, Schwark filed a petition for probate, issuance of letters testamentary, and determination of heir-at-law. On April 16, 2015, the court admitted the will to probate and granted the letters testamentary. On July 20, 2015, the court entered an order declaring that there were no heirs-at-law. Months later, it was revealed that Harvey was actually survived by several nieces and nephews, including Robin Chimento, Patricia Lukosavich, Robert Lester Harvey, Pamela Kenik, Daria Shirley, Jane Harvey, and Wendy

---

[3] Robert Harvey was Harvey's older brother. The record reveals that they were close. Although Robert lived in Ohio, they would still try to see each other as often as they could. For many years, they did an annual hunting trip in Colorado. However, when they got older, Robert would get his kids to drive him to Harvey's house, or Harvey would travel to Ohio. Robert passed away in April 2014.

Medley.[4]  Chimento contacted Schwark and informed her that she was Harvey's niece. Chimento testified that she became aware that Harvey had passed away because her nephew, Robert Lukosavich,[5] received a letter from the Department of Veterans Affairs indicating that he was the beneficiary of one of Harvey's life insurance policies.

¶10.    On September 17, 2015, Chimento, Patricia, Robert, Pamela, Shirley, and Wendy filed a motion to set aside the order establishing the heirs-at-law.  In response, Schwark claimed she was not aware they existed until Chimento made her aware of them.  Schwark did not contest the motion and requested that a new publication be completed.  On October 1, 2015, the petitioners filed a caveat objecting to the probate of Harvey's will, claiming that Harvey lacked testamentary capacity and that Schwark exercised undue influence over Harvey.  On November 3, 2015, the petitioners also filed a petition for injunction seeking to enjoin Schwark from altering or disposing of any estate assets.  On January 22, 2016, the court granted the petitioner's motion to set aside the probate order after finding that the will was not properly authenticated before being admitted to probate.  That same day, an agreed order enjoining Schwark from altering or disposing of the estate assets was entered.

¶11.    On September 18, 2018, Chimento filed a motion to produce the original will. In the motion, Chimento represented, "The Movant would show that the original Will was purported to be recorded in the registry of the Court, however Movant was advised by the Clerk that the original Will is not there and the Clerk only has a copy."  Schwark revealed

---

[4] These individuals were Robert Harvey's children.

[5] Robert Lukosavich was the son of Chimento's older sister, Patricia Lukosavich, and the great-nephew of Harvey.  We note that he was not a party in this dispute.

that this prompted her to go search Harvey's home for the original will; however, she was unable to locate it due to the condition of Harvey's home. Schwark testified that she discovered mold and critters all over his home. There was evidence and testimony that Harvey was a hoarder. Pictures of his house were introduced into evidence showing trash and boxes stacked to the ceiling. She recalled two occasions where she tried to locate the original will in Harvey's home. On the first visit, Schwark fell through a rotted floor and had to seek medical treatment. On the second visit, she found several papers tucked in the side of the recliner in which Harvey died. She revealed that his bodily fluids had seeped into the papers: "Everything was kind of mashed together. Like paper had dissolved together. It was all around where he was sitting."

¶12. On May 13, 2019, Schwark filed a motion for summary judgment, arguing that she established a prima facie case that Harvey's will was valid and that the petitioners failed to offer any evidence of testamentary incapacity or undue influence. The court denied the motion on August 21, 2019. The petitioners subsequently filed a motion for summary judgment on February 26, 2020. They argued that Schwark had failed to produce the original will, so therefore the will could not be admitted to probate. The court denied the motion on August 27, 2020. Trial commenced on February 23, 2023.

¶13. At trial, Chimento claimed that despite not seeing him often, their family was still close to Harvey. She testified, "Uncle Leonard was tied to his family, his nieces and his nephews, and he would have never left anything outside of the family. He was close to his nieces and nephews." Out of all the nieces and nephews, Chimento was closest in proximity

7

to Harvey because she lived in Slidell, Louisiana. She explained that she would sometimes stop by Harvey's house or go to a restaurant with him. She testified that the last time she saw Harvey was in July 2014. Her father had passed away a few months prior and she and her husband delivered some of his old items to Harvey. She also claimed that the last time she spoke to Harvey was in October 2014. All the other surviving family members had not seen or spoken to Harvey in several years before he died.

¶14. Chimento, Patricia, and Wendy expressed their belief that the will was fabricated and did not accurately reflect Harvey's true intent. There were four things in particular that sparked this speculation. First, they claimed that the VA was not aware that Harvey had died and that they still had appointments scheduled for him. Second, they saw that Chimento and her husband were listed as Harvey's niece and nephew in his VA records and the police report. Third, they claimed that Harvey would have handwritten his will instead of allowing someone to type it. Chimento testified, "He is very private. He would not have wanted somebody else to know his business. So I could just -- from what I knew about him, he would have written something indicating what he wanted done with his property with his assets, and that would be it." Lastly, they claimed that Harvey would have wanted to be buried instead of cremated.

¶15. Chimeto also testified that Harvey had sent Lukosavich a handwritten letter in December 2014, explaining that he was adding Lukosavich to his Keesler Federal Credit Union account and granting him access to his safety deposit box at Hancock Bank. The letter instructed Lukosavich to send the attached forms back to Harvey so that he could update his

8

account information. Patricia testified, "It did not make any sense to me that [Harvey] would be sending financial documents to relatives and then two weeks later sign a Will that said he had no relatives, and was signing everything to a total stranger."

¶16. On March 9, 2023, the court entered the judgment and order establishing the will's validity. The court held that Schwark had "overcome and rebutted the presumption of revocation based on clear and convincing evidence" and that the will was valid. Aggrieved, Chimento now appeals.

## STANDARD OF REVIEW

¶17. "In reviewing a chancellor's findings, we employ an abuse-of-discretion standard of review." *Mays v. Zumwalt (In re Est. of Amburn)*, 301 So. 3d 737, 740 (¶7) (Miss. Ct. App. 2020) (quoting *Covington v. McDaniel (In re Est. of Necaise)*, 126 So. 3d 49, 56 (¶22) (Miss. Ct. App. 2013)). "This Court will not disturb a chancellor's findings of fact in a will contest unless the findings are clearly erroneous or manifestly wrong, or the chancellor applied an incorrect legal standard." *Id*. "However, when considering a question of law, we employ a de novo standard of review." *Id*.

## DISCUSSION

### I. Testamentary Capacity

¶18. Chimento asserts that Schwark failed to meet her burden of proving that Harvey possessed testamentary capacity. "For a will to be valid, the testator must possess testamentary capacity." *Est. of Phelps v. Phelps*, 180 So. 3d 835, 839 (¶15) (Miss. Ct. App. 2015) (quoting *Noblin v. Burgess*, 54 So. 3d 282, 291 (¶32) (Miss. Ct. App. 2010)). "For

9

testamentary capacity to be present, the testator must be of 'sound and disposing mind' at the time of the will's execution." *Id*. (quoting Miss. Code Ann. § 91-5-1 (Rev. 2004)). "At that time, the testator must: 'understand and appreciate the nature and effect of his act of making a will, the natural objects or persons to receive his bounty and their relation to him, and be able to determine what disposition he desires to make of his property.'" *Id*. (quoting *In re Est. of Mask*, 703 So. 2d 852, 856 (¶17) (Miss. 1997)).

¶19.    "Testamentary capacity is determined based on three factors: (1) whether the testator had the ability at the time of the will to understand and appreciate the effects of his act; (2) whether the testator had the ability at the time of the will to understand the natural objects or persons to receive his bounty and their relation to him; and (3) whether the testator was capable of determining at the time of the will what disposition he desired to make of his property." *Id*. (quoting *In re Est. of Laughter*, 23 So. 3d 1055, 1061 (¶20) (Miss. 2009)). "The key to testamentary capacity is mental competency at the time the will is made." *Id*. (quoting *Lee v. Lee*, 337 So. 2d 713, 715 (Miss. 1976)).

¶20.    Our Supreme Court has explained the burden of proof concerning testamentary capacity:

> At trial, the will's proponents carry the burden of proof, which they meet by the offering and receipt into evidence of the will and the record of probate. A prima facie case is made by the proponent solely by this proof. Afterwards, although the burden of proof remains on the proponents, the burden of going forward with proof of testamentary incapacity shifts to the contestants, who must overcome the prima facie case. The proponents may then present rebuttal proof if necessary. In short, the proponents must prove the testator's testamentary capacity by a preponderance of the evidence.

*In re Est. of Phelps*, 180 So. 3d at 839 (¶16) (quoting *In re Est. of Rutland v. Rutland*, 24 So.

10

3d 347, 351 (¶10) (Miss. Ct. App. 2009)).

¶21. We find that Chimento failed to come forward with evidence to "to overcome the prima facie case" of testamentary capacity. She asserted that Harvey must have lacked testamentary capacity because he would not have left all his property to someone that was not in the family. However, the record reveals that the nieces and nephews seldom visited Harvey and spent very little time with him. Schwark, on the other hand, was one of the few individuals who often checked on Harvey and helped him when he needed assistance. Parker revealed that Harvey was "adamant" about leaving his property to Schwark, despite knowing that he had family:

> Q.	So he knew about the two nieces?
>
> A.	Yes, sir. He told me about them. I didn't know he had any.
>
> Q.	Did not want to leave them anything in his Will?
>
> A.	Absolutely nothing. Now, that's his words and I'm quoting them.
>
> Q.	But he wanted to leave I guess everything to Nina Schwark?
>
> A.	Yes, sir.
>
> Q.	And why did he say he wanted to leave it to Nina?
>
> A.	He just said that the people -- his kin people in Gulfport -- and I'm going to quote this now the best I can -- had never done anything for him. And she's the only one that's took the time to check on him and come take him to dinner and stuff like this, little things that he - - and he was such a simple person, those mean a lot to him.

Chimento also alleged that Harvey had paranoid schizophrenia; however, no medical records were offered during trial to confirm that Harvey suffered from this condition. Chimento even

11

admitted that she felt like Harvey was in his right mind before he died:

Q.     . . . When you talked with Mr. Harvey at any time before his death, did you hear him say anything to you or to anybody else that would make you think he didn't know what he was doing or where he was or anything like that?

A.     No.

Q.     All right.  Did you ever call anybody, whether it's a professional-type person like a doctor or a counselor or a psychiatrist, or any other family members and tell them, "I think Mr. Harvey's slipping," or, "He's out of his mind," or, "He doesn't know where he is or what he's doing?"

A.     No.

Similarly, Wendy Medley could not say that she thought Harvey lacked testamentary capacity:

Q.     Okay.  Give me any reason you can think of, or even a feeling, if it's just a feeling that you have, that leads you to believe that Leonard's mind was gone or that he didn't know what he was doing when he executed this will.

A.     I don't have any reasons personally.

¶22.   The record contains ample deposition and trial testimony confirming that Harvey possessed testamentary capacity at the time he executed his will.  During his deposition, Parker testified that he believed that Harvey had his right mind in 2015:

Q.     In 2015 or early 2016, any time -- I'm sorry, '14 and '15, any time you'd go over there and check on him, did he ever seem like he was out of his mind or did he say anything that you thought was odd or weird?

A.     No, sir.  You'd have to know Mr. Harvey, because Mr. Harvey was weird anyway.  It was just the way he was.  And it wasn't because of lack of knowledge, he was just a very private person.

When asked if there was ever a time that he felt like Harvey's mind was slipping, Parker

12

testified

> Oh, no.  The only time that I noticed Mr. Harvey, not slipping, really, but that last two weeks he was having a lot of heart problems. . . .  But that's the only time -- the latter part of that, about two weeks before that, I noticed that he just didn't feel good.  You know, I could tell.  But ever knowing him not to be capable.  I mean, when he was eighty-one, he was building a fence out next to the road.  And he had good brains.

Similarly, Schwark revealed during her deposition that Harvey's mental condition was normal before he died.

> Q.      Do you know anything about his mental condition before he died?
>
> A.      How long before he died? ·
>
> Q.      Let's say six months before he died.
>
> A.      Oh, yeah.
>
> Q.      Tell me about that.
>
> A.      He was the Mr. Harvey I always knew.

¶23.    "In considering all the evidence, some testimony will receive greater weight. The testimony of subscribing witnesses receives greater weight than the testimony of witnesses who were not present at the will's execution." *In re Est. of McQueen*, 918 So. 2d 864, 871 (¶30) (Miss. Ct. App. 2005) (citing *In re Est. of Edwards*, 520 So. 2d 1370, 1373 (Miss.1988)).  Both Herring and Jalanivich certified that on the day in question, Harvey was "of sound and disposing mind and memory, mentally alert, and possessed of all his mental faculties."  A few days after the will was executed, they again asserted that Harvey was mentally competent in their individual affidavits.  Herring also testified at trial regarding Harvey's mental condition:

Q. All right. And as far as Mr. Harvey's physical and mental condition that day, how would you describe it?

A. Mr. Harvey's always been the same.

Q. Nothing unusual about him that day?

A. No.

The Chancellor gave due credit to Herring's testimony as opposed to Harvey's nieces, who were not present when the will was executed. All the individuals who had a relationship with Harvey and had actually interacted with Harvey not long before his passing testified that he was in his right mind, that he understood that he was leaving his property to Schwark, and that he was clear that he only wanted her to receive. Chimento and the other contestants failed to present any evidence to demonstrate the contrary. Accordingly, we find that this issue is without merit.

## II. Undue Influence

¶24. Chimento also argues that Schwark was in a confidential relationship with Harvey. She further asserts that the fact that Schwark's daughter, Herring, was involved in the execution of the will demonstrated a suspicious circumstance because Herring was not a disinterested witness. "A presumption of undue influence arises where: (1) a confidential relationship existed between the testator and a beneficiary, and (2) there existed suspicious circumstances—such as the testator's mental infirmity—or the beneficiary in the confidential relationship was actively involved in some way with preparing or executing the will." *Est. of Phelps*, 180 So. 3d at 840 (¶23) (citing *In re Last Will & Testament of Bowling*, 155 So. 3d 907, 910-11 (¶16) (Miss. Ct. App. 2014)). "The contestant of the probated will has the

burden of establishing the existence of a confidential relationship between the testator and the beneficiary." *In re Est. of Williams*, 379 So. 3d 968, 980 (¶44) (Miss. Ct. App. 2024) (citing *Norris v. Norris*, 498 So. 2d 809, 813 (Miss. 1986)). If the contestant proves that there was a confidential relationship, "[t]he burden shifts then to the one who wishes to uphold the gift to rebut the presumption by clear and convincing evidence." *In re Caspelich*, 22 So. 3d 1199, 1205 (¶19) (Miss. Ct. App. 2009).

¶25.   "A confidential relationship exists when a dominant over-mastering influence controls over a dependent person or trust, justifiably reposed." *In re Est. of Thornton*, 922 So. 2d 850, 852-53 (¶7) (Miss. Ct. App. 2006) (citing *In re Estate of Dabney*, 740 So. 2d 915, 919 (¶12) (Miss. 1999)).

> The factors used to determine whether a confidential relationship existed between the testator and beneficiary are:
>
> > (1) whether one person has to be taken care of by others,
> >
> > (2) whether one person maintains a close relationship with another,
> >
> > (3) whether one person is provided transportation and has their medical care provided for by another,
> >
> > (4) whether one person maintains joint accounts with another,
> >
> > (5) whether one is physically or mentally weak,
> >
> > (6) whether one is of advanced age or poor health, and
> >
> > (7) whether there exists a power of attorney between the one and another.

*Id.* Here, a few factors are applicable. Harvey was of advanced age and poor health. Due to his increasing health problems, Harvey did receive some assistance from Schwark,

Charles, and Parker. However, they did not take care of him on a regular basis. There was evidence that Harvey mainly took care of himself. Although Harvey had health problems, he was not physically or mentally weak. Several people testified that Harvey was highly intelligent, still active, able to do work on cars and his house, and still driving himself at the age of eighty-four. He only needed transportation when he was having car problems or medical emergencies. Although Schwark testified that she took Harvey to some of his doctor appointments and the hospital, it could not be said that she provided for Harvey's medical care. There was evidence that Harvey maintained a joint account with Schwark. There was also evidence that Harvey and Schwark had a close relationship. He was close friends with Schwark's father for over fifty years and had known her since she was a child. Lastly, Chimento alleged that Schwark had power of attorney over Harvey; however, the record confirms this was not the case.

¶26. "A presumption of undue influence is not raised merely because a beneficiary occupies a confidential relationship with the testator; something more is required, such as active participation by the beneficiary in the procurement, preparation or execution of the will or mental infirmity of the testator." *In re Est. of Williams*, 379 So. 3d 968, 980-81 (¶45) (Miss. Ct. App. 2024) (quoting *Est. of Sandlin v. Sandlin*, 790 So. 2d 850, 854 (¶9) (Miss. Ct. App. 2001)). "The existence of a confidential relationship, standing alone, does not give rise to a presumption of undue influence." *Id*. (citing *In re Will of Adams*, 529 So. 2d 611, 615 (Miss.1988)). "For testamentary gifts, '[i]f it is determined that a confidential relationship exists, an abuse of that relationship must be shown for the [c]ontestants to raise

16

a proper presumption of undue influence.'" *Id.* (quoting *Kimbrough v. Est. of Kimbrough*, 134 So. 3d 281, 285 (¶13) (Miss. 2014)). "[E]ven when a confidential relationship can be said to exist between the parties, . . . the beneficiary under the will must have used that relationship for his personal gain or to thwart the intent of [the] testator." *Id.* (citing *Costello v. Hall*, 506 So. 2d 293, 298 (Miss. 1987)).

¶27.    Although it can be argued that a confidential relationship existed between Harvey and Schwark, it cannot be said that Schwark used that relationship for her personal gain or to thwart Harvey's intent.    Furthermore, she was certainly not involved in preparing or executing Harvey's will.    Schwark's uncontradicted testimony was that she was working in Houston when Harvey had his will prepared and did not see a copy of the will until she came home to handle his funeral arrangements.    Also, the fact that Herring was involved in executing the will does not necessarily mean that Schwark was somehow involved.    Harvey knew that Herring was a notary, and he simply asked her to come and notarize the will. While reading the document, she saw that he needed two witnesses, and since she was already there, she served as one.    Nothing in the record suggests that something nefarious was going on.

¶28.    Additionally, Parker's deposition testimony confirmed that Schwark was not trying to influence or control Harvey:

> Q.    Did you ever see Nina do anything that you thought was out of the way with Mr. Harvey?
>
> A.    No, sir.
>
> Q.    Did you ever see her force him to do anything?

17

A. Oh, no. No, sir.

Q. Was he the kind of person that you could get something over on?

A. No, sir. I don't think so. Personal opinion. He was a pretty smart man.

¶29. Taking all this into consideration, we cannot say that there was any abuse or suspicious circumstances that would give rise to a presumption of undue influence. This issue is without merit.

### III. Due Execution

¶30. Chimento also claims that Herring and Jalanivich could not prove the due execution of the will. Mississippi Code Annotated section 91-5-1 provides the requirements for the valid execution of a will:

> Every person eighteen (18) years of age or older, being of sound and disposing mind, shall have power, by last will and testament, or codicil in writing, to devise all the estate, right, title and interest in possession, reversion, or remainder, which he or she hath, or at the time of his or her death shall have, of, in, or to lands, tenements, hereditaments, or annuities, or rents charged upon or issuing out of them, or goods and chattels, and personal estate of any description whatever, provided such last will and testament, or codicil, be signed by the testator or testatrix, or by some other person in his or her presence and by his or her express direction. Moreover, if not wholly written and subscribed by himself or herself, it shall be attested by two (2) or more credible witnesses in the presence of the testator or testatrix.

Miss. Code Ann. § 91-5-1 (Rev. 2021). Mississippi Code Annotated section 91-7-7 provides the requirements for proving the due execution of a will:

> The due execution of the will, whether heretofore or hereafter executed, must be proved by at least one (1) of the subscribing witnesses, if alive and competent to testify. If none of the subscribing witnesses can be produced to prove the execution of the will, it may be established by proving the handwriting of a testator and of the subscribing witnesses to the will, or of some of them. The execution of the will may be proved by affidavits of

18

subscribing witnesses. The affidavits may be annexed to the will or may be a part of the will, and shall state the address of each subscribing witness. Such affidavits may be signed at the time that the will is executed.

Miss. Code Ann. § 91-7-7 (Rev. 2021).

¶31. Here, due execution of the will was proven by the subscribing witnesses. Herring and Jalanivich signed the will and provided their addresses in the attestation clause. On the same day that the will was executed, Herring and Jalanivich also signed an affidavit. The affidavit stated,

> We, each of the subscribing witnesses to the foregoing Last Will and Testament of Leonard Allen Harvey, do hereby certify that said instrument was signed by the said Leonard Allen Harvey, in our presence and by each of us in the presence of one another, and that the said Leonard Allen Harvey declared the same to be his Last Will and Testament in the presence of each of us and that on said occasion the said Leonard Allen Harvey was of sound and disposing mind and memory and under no duress or undue influence and that we each signed as subscribing witnesses to said Will at the request of the said Leonard Allen Harvey in his presence and in the presence of each other.

The affidavit was annexed to the will. Herring and Jalanivich also completed separate affidavits a few days after the will was executed. Both affidavits confirmed that they served as witnesses and signed the will "at the same time and in the presence of each other." They also asserted that Harvey "was over the age of twenty-one (21) years and of sound and disposing mind and memory, mentally alert, and possessed of all his mental faculties."

¶32. Additionally, Herring confirmed through testimony at trial that she and Jalanivich witnessed Harvey sign the will. She testified that Harvey contacted her about notarizing the will at her grandparent's house. When she arrived, Jalanivich was visiting with Harvey and grandparents. She asked Jalanivich to serve as the additional witness so that her

19

grandparents would not have to get out of their recliners. She testified, "He came to the kitchen table, Mr. Harvey signed, [Jalanivich] signed and then he wrote his address down." The court even confirmed with Herring that they all three were present at the kitchen table and witnessed each other sign:

THE COURT:      Did you see him sign?

THE WITNESS:    I did. I saw both of them sign.

THE COURT:      Did Mark see him sign?

THE WITNESS:    (Nodding head.)

THE COURT:      Yes?

THE WITNESS:    Yes.

The testimony and evidence demonstrate that Herring and Jalanivich proved due execution of the will. Accordingly, this issue is without merit.

**IV.    Requirements for Probate**

¶33.    Chimento also contends that Schwark failed to prove the requirements needed to probate the will. One of the requirements is proof that the will was lost; therefore, we will combine issues four and five in this analysis.

¶34.    Our supreme court has held:

> The law regarding admission into probate of a lost will is discussed at length in *Warren v. Sidney's Estate*, 183 Miss. 669, 184 So. 806 (1938). That case sets forth the elements necessary to probate a copy of a lost will, which are: (1) the proof of the existence of the will; (2) evidence of its loss or destruction; and (3) proof of its contents. *Sidney's Estate*, 183 Miss. at 675-76, 184 So. at 807. A fourth element has been added: (4) that the testator did not destroy the will with the intent to revoke it. Robert A. Weems, Wills and Administration of Estates in Mississippi § 7–17 (1988). This last element arose from the

20

theory that when a will cannot be found following the death of a testator and it can be shown that the testator was the last person in possession of the will, there arises a rebuttable presumption of revocation.

*In re Est. of Cannon*, 733 So. 2d 245, 249 (¶19) (Miss. 1999). The proponent has the burden to prove each of these elements by clear and convincing evidence. *See Abshier v. Chapman (In re Est. of Mitchell)*, 623 So. 2d 274, 275 (Miss. 1993); *Est. of Leggett v. Smith*, 584 So. 2d 400, 403 (Miss. 1991).

¶35. "When a will is known to have existed and was in the maker's possession, but it cannot be found after the maker's death, the Mississippi Supreme Court has stated that a rebuttable presumption arises that the maker destroyed the will with the intent to revoke it." *Taylor v. Tolbert*, 342 So. 3d 1204, 1208 (¶22) (Miss. Ct. App. 2022) (citing *In re Est. of Mitchell*, 623 So. 2d at 275). "The presumption arises when the evidence shows (a) the would-be testator made a will, (b) last known to have been in its maker's possession prior to his death, but (c) not found after death despite diligent search." *Id*. at 1208 (¶24) (quoting *In re Est. of Leggett*, 584 So. 2d at 403).

¶36. Here, the evidence is uncontradicted that (a) Harvey made a will on January 17, 2015; (b) after the will was executed, Harvey left the place of execution with the original will in his possession; and (c) the will was not found after his death, despite a diligent search by Schwark. Schwark testified that she made two attempts to locate the original will. She knew that he often put important papers in his recliner, so she looked there hoping to find the original will:

> The only place that I could think that he would have put any other paperwork was in the recliner that he stayed in. And it had -- it had papers tucked down

21

in the side. But that is the -- that's the chair that he died in, and anything that was in that chair was destroyed.

Nothing in the record suggests that Harvey intended to destroy his will. Instead, the evidence suggests that the will was accidentally destroyed. Also, no evidence in the record suggests that Schwark destroyed the original will. In fact, she was not even aware that Harvey had executed a will and left all his property to her until after his death. Herring testified that she never informed her mother about the execution or the contents of the will. Schwark also revealed that her father never informed her about the will. He simply gave her the sealed envelope that Harvey had dropped off at his house for her. In the final judgment, the trial court opined:

> The uncontroverted testimony at trial and the most clear and convincing evidence the Court heard was that Ms. Schwark did not know about the will and could not have destroyed the original will as, at the time the will was made on January 7, 2015, she was working in Houston, Texas, for a year and only came home after Mr. Harvey's death, when he was found on February 21, 2015, as stated in the Certificate of Death. Ms. Schwark received an envelope from her father with a copy of the will, which was later probated. The fact that Mr. Harvey made the will, which was duly executed, and he was found dead approximately six (6) weeks later, coupled with the fact that prior to his death, he left the envelope with Ms. Schwark's father, which was sealed and contained a copy of the original will, further overcomes the presumption of revocation.

We find that sufficient evidence in the record supports this finding. Our Supreme Court has held, "'Where—as here—a trial judge sits without a jury,[it] will not disturb his factual determinations where there may be found in the record substantial supporting evidence.'" *In re Est. of Cannon*, 733 So. 2d 245, 248 (¶17) (Miss. 1999) (quoting *In re Est. of Tallant v. Tallant*, 644 So. 2d 1189 (Miss. 1994)). "We must 'affirm a chancellor on a question of

fact unless upon review of the record we be left with the firm and definite view that a mistake has been made.'" *Id.* (quoting *Snow Lake v. Smith*, 610 So. 2d 357, 360 (Miss. 1992)). Accordingly, we find no error in the chancellor's determination that Schwark overcame the presumption of revocation.

## CONCLUSION

¶37. Based on our review of the record, we find that the chancellor did not err in admitting Harvey's will for probate. There was no evidence of undue influence. Schwark overcame the presumption of revocation and proved that Harvey possessed testamentary capacity when the will was executed. Harvey intentionally chose to leave his property to Schwark because she cared for him, and he considered her to be his daughter, "not by blood but by choice." Additionally, the evidence and testimony confirmed that the will was properly executed. The chancellor made specific findings, and his decision was supported by substantial evidence in the record. We are not at liberty to substitute our judgment for the chancellor's. Thus, we must affirm the judgment of the Jackson County Chancery Court.

¶38. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., McDONALD, LAWRENCE, McCARTY, EMFINGER AND WEDDLE, JJ., CONCUR. ST. PÉ, J., NOT PARTICIPATING.**

23